**TILLINGHAST, Commissioner of Immigration, v. FLYNN ex rel. CHIN KING.**

**No. 2407.**

Circuit Court of Appeals, First Circuit.

Feb. 17, 1930.

Anderson, Circuit Judge, dissenting.

John W. Schenck, Asst. U. S. Atty., of Boston, Mass. (Frederick H. Tarr, U. S. Atty., of Boston, Mass., on the brief), for appellant.

Walter Bates Farr, of Boston, Mass. (E. F. Damon, of Boston, Mass., on the brief), for appellee.

Before BINGHAM, ANDERSON, and WILSON, Circuit Judges.

WILSON, Circuit Judge. ·

A Chinese boy, thirteen years of age, applied for admission to this country, claiming to be Chin King, the son of Chin Wing, an American citizen. After numerous hearings he was excluded by order of the Board of Special Inquiry, which order was affirmed by the Secretary of Labor on appeal.

The applicant then applied for a writ of habeas corpus to the District Court of Massachusetts, which court ordered the writ to issue, from which order [32 F.(2d) 359] the representative of the government appeals to this court.

The burden is on an applicant seeking to establish his right to enter this country as the son of an American citizen to prove the citizenship of his father and the alleged relationship.

It is admitted that Chin Wing is an American citizen. The evidence is also sufficient to establish the fact that Chin Wing had a son born in 1916 and named Chin King. The real issue before the Immigration Board and the Department of Labor, therefore, was whether this applicant is the son of Chin Wing, that was born in 1916 and bears the name of Chin King.

On this point the applicant and the father, of course, testified, and two Chinese witnesses identified the photograph attached to the affidavit in the case as that of Chin King, the son of Chin Wing, as alleged, and a third Chinaman, a young man by the name of Wong Fook Gim, or Sidney Kwong, as he is known in this country, a student at the University of Richmond in Richmond, Va., testified that he was in China in 1923 and met Chin Wing and a boy about six or seven years old, whom Chin Wing said was his son and whom the photograph of the applicant strongly resembles. There was also the tes-

timony of a Mrs. Lulu Evans, who corroborated the testimony of Sidney Kwong as to meeting Chin Wing in Hong Kong in 1923 accompanied by a small boy, but she could not identify the photograph of the applicant as that boy.

The testimony offered by the applicant and his witnesses, however, when examined, presented many discrepancies and improbabilities, and we think, notwithstanding the testimony of the identifying witnesses, is not sufficiently compelling as to require a reasonable and open mind to find that the identity of the applicant as the son of Chin Wing is so conclusively established that a contrary conclusion by the Board was purely arbitrary and amounted to a denial of due process.

Whether the immigration officials accepted as true the admissions of the father that, when he sought to bring in a Chinese boy as his eldest son in 1922, he was then attempting to perpetrate a fraud upon the government, as they well might in view also of the confession of the then applicant that he was not the son of Chin Wing, or whether they accepted his explanation and his reasons for repudiating his son at that time, in view of the many improbabilities and discrepancies which appeared in the evidence, doubt is at once raised as to the credibility of the testimony and good faith of the father in this case and warranted the scrutiny of the evidence presented by this boy with great care.

If we accept the statement of Chin Wing that the boy who applied in 1922 was his son, Chin Tung, the evidence of the witness Lee Jin Hang, who testified that the photograph of the applicant attached to his affidavit was that of Chin King, the son of Chin Wing, whom he last saw in China not later than January, 1922, when the applicant was but little more than five years of age, is not compelling, in view of his testimony that, although he visited the home of Chin Wing in 1920 to carry a letter and money to the wife, and just before he returned in January, 1922, again visited the home to see if the wife had any message to send to her husband in this country, he neither saw Chin Tung, who was then living at the home with the mother and Chin King, nor was he informed by the mother that her eldest son was also about to sail for the new and great country to join the father to whom Lee Jin Hang was to take a message, and notwithstanding the testimony of Lee Jin Hang would have been of the greatest assistance in accomplishing his entry, and the departure of a son to join the father in a strange land must have been a red letter event in that home.

But, since it was quite apparent that the explanation of Chin Wing that the applicant whom he repudiated in 1922 was in fact his son, Chin Tung, required corroboration, Lee Jin Hang, very fortunately it would seem, happened to enter a store in Hong Kong just before sailing, where he was informed that a son of Chin Toy Mun (which is the married name of Chin Wing), was about to sail for this country, but that the steamship company would not sell the boy a ticket unless there was some one to care for him on the voyage, and further testified that he actually saw this boy on the same boat on which he sailed, who also informed him that he was the son of Chin Toy Mun; and, although the boy was in charge of a Chinaman by the name of Lee Chin Hong, Lee Jin Hang did not meet Lee Chin Hong on the boat, nor ascertain from the boy who had the care of him. He denied that he then knew that the married name of Chin Wing, whom he had known for several years, was Chin Toy Mun; and on his return, when examined at the port of entry, also denied carrying any message or money to any one in China, the reason now given being that he thought it might be against the law to carry out of the country an unstamped letter.

The evidence of Lee Jin Hang, in view of these circumstances and the fact that he had not seen the applicant since he was less than five and one-half years old, presented such improbabilities that we cannot say the Board was arbitrary in refusing to accept his identification of the applicant as conclusive or, with the other evidence, as compelling belief.

As to the other identifying witness, Wong Toy, although he claimed that he was in China at the home of Chin Wing and saw the son Chin King there, probably during the year 1923, and talked and had tea with Chin Wing in the presence of Chin King when Chin King was perhaps seven years of age, the applicant has no recollection of ever seeing Wong Toy, although he claimed to remember distinctly the visit of Lee Jin Hang and identified one of the photographs shown him as that of Lee Jin Hang whom he saw only once when he was less than four years old, and once when he was not quite five and one-half years of age. Wong Toy, on his return to this country, denied seeing, while in China, a child of any American citizen. His only explanation of this denial was that he did not remember making the statement. It is passed over by counsel, however, as merely an answer to a "stock question" of no importance.

Neither was the testimony of the young man, Sidney Kwong, of substantial weight.

He testified that he, in the company of an American lady, Mrs. Evans, met Chin Wing and a Chinese boy about six or seven years old on a street in Hong Kong in 1923, and was told by Chin Wing that it was his son. The most the witness could say, when orally examined before the Board, was that he saw a strong resemblance between the photograph of the thirteen year old applicant and the six and one-half year old boy he met in Hong Kong six years before. The evidence of the American lady who was with him has no bearing, except upon the issue of relationship, as she did not undertake to identify the applicant as the boy she saw in Hong Kong.

It may well have impressed the Board that there was still more that required explaining, if, as is now claimed, it was in fact Chin Tung, the eldest son of Chin Wing, who applied in 1922 and was rejected, and that the true explanation of the story then told by the father and the boy is that, owing to the death of a first-born, and in accordance with a Chinese custom, this boy was, when very young, adopted by a distant relative, Chin See Ming, and took the name of Hung Ock, or Chin Hung Ock, Jr., Chin See Ming having a son of his own by name Chin Hung Ock; and that Chin Wing was moved by threats of jail to repudiate his own son— though what moved Chin Tung, if he was the son of Chin Wing, one being examined in Seattle and the other in New York, also to confess to a fraud, is not explained.

Chin King, however, testified that he never heard of Hung Ock or Chin See Ming, though they were supposed to be living in the small village of Ngar You Gong, a village of only five houses, at the same time when he and his mother lived there. He also says that his brother, Chin Tung, always lived with him and his mother; that he never heard of a brother dying in infancy, or of his brother applying for admission to this country and being rejected, although after the first order of exclusion, on the case being reopened, he then testified that he did know of his brother being away from home for three or four months at what may have been about the time it is now claimed the alleged Chin Tung made his application in 1922. He later admitted, however, that he had no personal recollection of his brother's absence, but that his mother had at some time told him of it.

And further and stranger still, although he had been told by his mother of his brother's absence from home for three or four months, and he himself at the same age was about to take the same journey and go

through the same ordeal as his older brother had, was never informed by his mother of the experience of the older brother, or by his father, who returned to China soon after the deportation of the older brother, if he was such, nor did the older brother ever impart to this applicant knowledge of the adventure he had in 1922, which resulted in failure, although it is claimed that he had since worked in the same small village and apparently had lived in the same home as this applicant up to time of the applicant's departure.

In view of the many improbabilities in the testimony of the witnesses, if this applicant is the son of Chin Wing, and of his erroneous information as to the age of his own father, a discrepancy of six years, and of the age of an aunt, of about fourteen years, and as to whether his maternal grandmother was living or dead; his ability to recall certain facts of family history and his domestic life, and his inability to recall when he last saw his father, although, after the evidence of Sidney Kwong and the American lady was discovered, he recalled perfectly well meeting them in Hong Kong in the company of his father, yet he could not tell how he went to Hong Kong, or whether they went into any stores or where they stopped; his insistence at the first hearings that he had lived continuously in the village of Gong Yick Market since birth, and then, after being notified of his exclusion and the alleged attempt of one claiming to be his oldest brother to enter this country, remembered that he lived, or had been told that he lived, in the village of Ngar You Gong for five years or until after 1922, which was the place where the boy who applied for entry at Seattle in 1922 was said to live with his mother—in view of all these discrepancies and improbabilities, a substantial doubt might well be raised in a reasonable mind as to whether this applicant is the son of Chin Wing, by name Chin King.

As has been so often held on habeas corpus proceedings, it is not a question of what this court would have found upon the evidence, or whether it appears to the court that the decision of the Board was wrong, but whether it was without any substantial evidence to support it and so arbitrary as to amount to a denial of due process.

Upon the whole evidence we think the Board did not act in that arbitrary manner which amounts to a denial of due process in failing to find the evidence of the applicant and of his witnesses to be conclusive and in ordering the applicant's deportation.

The order of the District Court is reversed, and the case is remanded to that court, with direction that the writ of habeas corpus be denied.

ANDERSON, Circuit Judge, dissents for the reasons adequately stated by Judge Morton in his careful opinion. 32 F.(2d) 359.