**Vernon E. PRESSLEY, Appellant,**

v.

**FEDERAL COMMUNICATIONS COMMISSION.**

**Western North Carolina Broadcasters, Inc., Intervenor.**

**No. 23657.**

United States Court of Appeals, District of Columbia Circuit.

Argued June 29, 1970.

Decided Nov. 13, 1970.

Mr. James A. Koerner, Washington, D.C., for appellant. Messrs. Keith E. Putbrese and Thomas W. Fletcher, Washington, D.C., were on the brief for appellant.

Mr. D. Biard MacGuineas, Counsel, Federal Communications Commission, with whom Messrs. Henry Geller, General Counsel, John H. Conlin, Associate General Counsel, and Mrs. Lenore G. Ehrig, Counsel, Federal Communications Commission, were on the brief, for appellee.

Mr. Joseph F. Hennessey, Washington, D.C., with whom Messrs. Lee G. Lovett and Eric T. Esbensen, Washington, D.C., were on the brief, for intervenor.

Before WRIGHT, McGOWAN, and MacKINNON, Circuit Judges.

McGOWAN, Circuit Judge:

Before us in this statutory review proceeding is an order of the Federal Communications Commission granting renewal of a radio license. The matter was designated for hearing upon issues related to the character qualifications of the licensee. Testimony was taken and an evidentiary record made. For the reasons hereinafter appearing, we believe that that record provides adequate support for the Commission's disposition of the matter, and we leave its order undisturbed.

I

The challenge to intervenor's moral fitness to continue as a licensee had essentially two foundations. One involved a charge that, when the controlling ownership of the license was acquired by intervenor in 1958, misrepresentations were made to the Commission in respect of the consideration paid for the majority stock interest.[1] We do not pursue this question in detail because our examination of the record on this score convinces us that the Commission's findings and conclusions on this point are amply anchored in the evidence. The second ground of attack presents much closer questions, involving, as it does, the perennially difficult problem of the relationship of an existing licensee to proceedings which delay or impede applications for competitive new authority. We turn to the facts giving rise to this issue in the case before us.

The intervenor corporation is the licensee of an AM radio station (WWIT) in Canton, North Carolina. At the time of intervenor's acquisition of the station in 1958, appellant was one of its employees. Learning that the station was for sale, he made an offer which was turned down because it was below the asking price. Not long thereafter he heard that another frequency was available for use in Canton, and decided to apply for it, quitting his job with WWIT and taking a better job at another station in the process.

When appellant's application for the new channel was filed, the management of WWIT was not pleased. Appellant's brother, who was still working for WWIT, was fired. One of WWIT's principals, Watts, made an effort to buy an outstanding note of appellant's with a purpose to collect it and thereby affect adversely appellant's financial qualifications. Paxton, another of WWIT's owners, had an interference chart prepared and exhibited it to two stations shown by the chart to be subject to interference from appellant's proposed new operation.

Appellant's present claim is that WWIT did not limit its disaffection with his application to these activities.

---

1. The charge arose out of the failure of intervenor to file with the Commission, as required by its regulations, a consulting contract between the new owner and two of the five selling stockholders. The Commission found the arrangement to be a part of the purchase price. It could not, however, identify any improper motivation for the failure to inform the Commission of its existence, and concluded that the omission could have resulted only from inadvertence. The trial examiner had concluded that the sinister purpose was tax evasion, but there was expert testimony by an independent tax specialist that no tax advantage could have been in view since the consulting fees were fully disclosed to the Internal Revenue Service.

He insists that its principals instigated and participated in the preparation and filing of an application by one Bryant for a station license in Asheville which was competitive with his own and which was assertedly designed to block or delay the grant of the authority he was seeking.[2] The Hearing Examiner, accepting appellant's contention, concluded that Paxton (1) participated in the preparation and filing of Bryant's application, (2) instigated Bryant, through the medium of one Edwards, to make the application, (3) provided cash for Bryant's initial application expenses, (4) made available to Bryant the technical assistance of his own employees, and (5) "with his aid, comfort, support and presence he shepherded Bryant" through the filing process.

The Commission's Broadcast Bureau took exception to the Examiner's recommendation that renewal be denied on this ground. It characterized the strike application issue as a "close question" of the kind as to which it ordinarily would accept the Examiner's judgment. The Bureau thought, however, that certain of the Examiner's findings "which are critical to the resolution of the strike application issue are [not] properly reflective of the record." The first such finding, in the view of the Bureau, was that Paxton had, utilizing Edwards for the purpose, recruited Bryant as a license applicant. A second was that Paxton had participated in the preparation of Bryant's application, in the sense of being present at, and assisting in, the drafting of the application.

Because the ultimate recommendation of the Examiner against renewal relied so heavily on these two findings, the Bureau professed to be unclear as to whether the Examiner would have reached the same result by reference to (1) the original hostility of WWIT to appellant's application, (2) the awareness of WWIT that the filing of Bryant's application by April 29, 1960, would, at the least, delay any possible grant of appellant's application, (3) Paxton's failure actively to discourage Bryant from filing his application before the cut-off date, and (4) certain of Paxton's actions which appeared to encourage Bryant, such as (a) rearranging the WWIT employee schedule so as to permit one employee, Slatkin, to assist in the preparation of Bryant's application, and (b) accompanying Bryant to Washington on two occasions when Bryant conferred with the attorney and engineer retained to handle his application. The Bureau concluded that all these circumstances could support a conclusion that Bryant's application was of a strike nature, although "it is by no means a clear cut question."

The Commission dealt with each of the matters identified by the Broadcast Bureau as a possible basis for denying renewal of intervenor's license. It found that WWIT initially "did not relish the prospect of competition from another station at Canton;" and that Paxton and Watts did explore the possibilities of embarrassing appellant financially through the purchase of his note, and did prepare and exhibit the interfer-

2. The WWIT renewal application here in issue was filed in 1960. Because of the then pendency of appellant's application for the Canton license and Bryant's application for the Asheville station, the Commission held intervenor's renewal application in abeyance, appellant having charged in the Canton-Asheville proceedings that the Bryant application had not been filed in good faith but only to prevent the grant of a license which would be competitive with WWIT. WWIT and Paxton were alleged by appellant to have been implicated in that bad faith. An engineering problem was raised by the Broadcast Bureau which ultimately resulted in the abandonment by Bryant of his application. Hearings were held in 1961–62 on appellant's application, and the examiner recommended the grant of a license. That initial decision became final automatically on November 28, 1962, when no exceptions were taken, and appellant became the licensee of Station WPTL in Canton. In 1965 appellant filed a petition to deny WWIT's renewal application, which had been pending since 1960.

ence chart. It found that Paxton did go to Washington twice with Bryant, but paid his own expenses on each occasion. It credited the testimony of Bryant and of the Washington engineer, Sharp, that Paxton had no financial interest in Bryant's application, and that Bryant intended to pursue his application in good faith. The Commission further found that a check for $500 given by Paxton to Bryant was for the purchase of an unrelated mineral interest and was not a cover for an advance of a sum to Bryant which happened to coincide with the amount of the engineer's retainer fee.

The Commission also found that Slatkin was the only employee of WWIT who worked on Bryant's application, and that this was done by Slatkin at the express request of Bryant, a prior acquaintance of Slatkin's. Paxton's only contribution to this end was the permission given Slatkin to trade working time with another employee in order to have a day free to help Bryant. A $50 check from WWIT to Slatkin a few days later was for extra work on a new program for WWIT and not for his work for Bryant, and was paid because Slatkin was only a temporary employee on a low salary.[3] The Commission characterized Paxton's interest in Bryant's project as "a modicum of assistance" rendered only after Bryant had decided to seek the license, and as attributable to their prior personal friendship.

The Commission found from the evidence that Bryant was "seriously interested in obtaining a license at Asheville;" and that his application ultimately foundered upon a technical engineering difficulty raised by the Broadcast Bureau which he was unable to overcome. It agreed with the Bureau that the record did not support the Examiner's finding that WWIT instigated Bryant's application.

## II

In dealing with this matter as a reviewing court, as distinct from the agency entrusted by the Congress with its resolution in the first instance, we can not be unmindful of the more restricted role we play. This is especially true in a case where the Broadcast Bureau, an entity expressly devised to take an independent role in Commission proceedings in the public interest, has concluded only that, although the matter is a close one, there is evidence in the record which would support the Commission in finding against intervenor *if* it should choose to do so. Had it so chosen, what is in essence the Bureau's prediction that such a decision by the Commission would have been left intact upon judicial review would in all likelihood have been borne out by our action. It is not our function, however, to say that the Commission must go one way rather than another when both avenues are open to it. Our inquiry here, therefore, is essentially to see whether there was substantial evidence in the record to support the path the Commission has taken. Universal Camera Corp. v. NLRB, 340 U.S. 474, 71 S.Ct. 456, 95 L. Ed. 456 (1951); *and see* Consolo v. Federal Maritime Commission, 383 U.S. 607, 620, 86 S.Ct. 1018, 1026, 16 L.Ed.2d 131 (1966), where the Supreme Court explicitly recognized that "the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence."

The exceptions taken by the Broadcast Bureau to the Examiner's findings on Paxton's alleged instigation of the Bryant application and his participation in the preparation of it were, we think, well taken. The first found its source only in Edwards' testimony, and the Examiner himself found him to be utterly

---

3. The Broadcast Bureau's exceptions to the Examiner's decision extended to his finding that the $50 check was compensation for his work on Bryant's application.

wanting in credibility. Bryant testified that the idea came to him from Edwards, and other facts in this record indicate that Paxton would have known how to communicate directly with Bryant if he had wanted to do so. As to the second, our reading of the record also accords with that of the Bureau; Paxton was not present when Slatkin worked on the application, nor did he examine the product of that effort.

The Bureau's exceptions extended explicitly to the findings with respect to the $50 payment to Slatkin, note 3 *supra*, and appear also to have embraced the matter of the $500 check given to Bryant by Paxton.[4] Although the Examiner purported not to be impressed with Paxton's forthrightness as a witness, he did not reject his testimony completely as he did in the case of Edwards, and the record as a whole on these points provided the Commission with a basis for its version of these particular factual matters.

The four remaining items, which the Bureau enumerated as leaving the matter in doubt, in reality reduce to one when closely examined. It appears to be true that WWIT did react in a hostile manner to the prospect of appellant's competing application; and its immediate responses reflect no credit upon it. But these were, on the Commission's findings, unrelated to the Bryant application; and it is the Bryant application which appellant asserts here to be the occasion of the prohibited strike action. It is also undoubtedly true, as the Bureau says, that WWIT was aware that the filing of Bryant's application by the cut-off date would assure some delay in the progress of appellant's, but this provides only a motivation for instigating or advancing that application, and does not show that such a motivation was implemented. It is further apparent that Paxton did not actively discourage Bry-

ant from filing his application, but surely there was no duty, moral or otherwise, resting upon Paxton to do that.

■ This left the Commission, at least in the Bureau's view, with these possible instances of active encouragement, *i. e.,* Paxton's trips to Washington with Bryant, and his rearrangement of Slatkin's work schedule so that he could work on Bryant's application. These were taken by the Commission to constitute "a modicum of assistance" which it did not consider as rising to the level of a character defect necessitating a denial of WWIT's qualifications to continue as a licensee. This determination by the Commission of what the Bureau itself characterized as "by no means a clear cut question" is not one which we are, on this record, warranted in revising, absent some basis for saying that it exceeded the Commission's statutory authority.

The Federal Communications Act does not address itself in terms to the matter of character qualifications. It says only that the Commission is authorized to issue licenses "to such citizens or nationals of the United States as the Commission finds qualified * * *" 47 U.S. C. § 303(*l*). The Commission has over the years derived from this broad charter an ethical standard which, in the case of the so-called "strike" application, finds its expression in the application form (F.C.C. Form 301) representation that "this application is not filed for the purpose of impeding, obstructing, or delaying determination on any other application with which it may be in conflict." *See* Ashbacker Radio Corp. v. FCC, 326 U.S. 327, 333, 66 S.Ct. 148, 90 L.Ed. 108 (1945), where the Supreme Court adverted to the harm inherent in bad faith applications, and assumed *bona fides* as an essential condition of the fairness of its comparative hearing requirement.

---

4. The Examiner's decision recites that "[t]he record furnishes no basis for a finding as to the precise understanding by which the $500 was made available to Bryant." He goes on to draw the infer-

ence from the coincidence of the purchase of the oil lease that Paxton's motive was to enable Bryant to pay the engineering retainer.

At the time the Bryant application was filed some ten years ago, the Commission appeared to regard the matter as turning on the good faith of the applicant, *i. e.*, Bryant. *See* Louisiana Broadcasting Co., 4 Pike & Fischer, R.R. 441 (1949). At about that time, however, the Commission recognized that an applicant, even though possessed of a *bona fide* purpose to pursue his application, might have been moved to do so by the invitation or assistance of another licensee who would be benefited thereby. Capital Broadcasting Co., 29 F.C.C. 677, 681–2 (1960); *and see* Gordon County Broadcasting Co. v. FCC, No. 19,165 (D.C.Cir., Sept. 14, 1965), affirming Blue Ridge Mountain Broadcasting Co., 37 F.C.C. 791 (1965).

Appellant urges that the legal error committed by the Commission here is that it regarded the finding of a lack of instigation as conclusive, without reference to any other factual circumstances, such as participation in preparation and other assistance; and it points in this regard to the asserted incompatibility of this approach with the following statement by the Commission in a recent case (Asheboro Broadcasting Co., 20 F.C.C.2d 1, 3 (1969)):

> "There should by now be no misunderstanding. Any licensee who is found to have participated in the filing of an application, one of whose purposes is the obstructing, impeding, or delaying of a grant of another application, places in jeopardy the authorization for the existing station which is the intended beneficiary of the strike application. This policy obtains even if the intention to obstruct, impede, or delay is not the sole reason for participation and even if the strike appli-

cant intends to build and operate the proposed station if his application is granted." [5]

We do not, however, read the Commission's decision as foreclosing appellant's challenge solely by reference to the finding of no instigation. The Commission went on to weigh the evidence on participation, including allegations of financial and other assistance. What it ultimately decided was that the record showed, at most, minor assistance of a non-financial nature which was not unnatural in view of the long-standing friendship between Paxton and Bryant. We cannot say that this result was at odds with the authority vested in the Commission by the Congress, nor with the handling by the Commission of other cases involving a similar challenge to the good character of the licensee.

Although we leave the Commission's order undisturbed in this case, we confess to some feeling of unease that a Commission policy of such obvious importance to the integrity of the Commission's admiristration of license grants and renewals should continue to be in such an inexact state of formulation. The Commission, we note, has never apparently endeavored to formulate regulations which might well provide a clearer guide to the kinds of conduct which will be regarded as disqualifying. It may be difficult to write rules of ethics, but it also may be better to have some rules than none at all, leaving the parties to discover only after the fact what the Commission conceives of as the permissible limits of the interest which a licensee can manifest in the applications of others. Where Congress has endowed the Commission with such a

---

5. These words are not a model of clear and complete statement which will give adequate prior notice of a standard by which conduct can be measured. In any event, they appear to be stronger than what the Commission has in fact done. *Asheboro* itself ended up in a failure to take any action by reason of an assumed strike application, because of "countervailing equities." In Sumiton Broad-

casting Co., 15 F.C.C.2d 400 (1968), the evidence showed instigation as well as participation in preparation of the strike application. In Al-Or Broadcasting Co., 37 F.C.C. 917 (1964), the showing was of active complicity in the initation of the strike application, as well as unmistakable signs that that application was single in its purpose to block the competing application.

broad grant of policy-making power, the utilization of rule making for a more precise articulation of the purposes of a policy and the ways in which it will be held to be transgressed would appear to be in the interest of fair and effective administrative regulation.

Affirmed.