FAULKNER RADIO, INC., Appellant,

v.

FEDERAL COMMUNICATIONS COM-
MISSION, Appellee, William P. Johnson
and Hollis B. Johnson, doing business as
Radio Carrollton, Intervenor.

No. 75–1568.

United States Court of Appeals,
District of Columbia Circuit.

Argued April 8, 1976.

Decided May 26, 1977.

Robert L. Heald, Washington, D. C., with
whom Marvin Rosenberg, Edward W. Hum-
mers, Jr., and Eric T. Esbensen, Wash-
ington, D. C., were on the brief, for appel-
lant. Frank U. Fletcher, Washington, D.
C., also entered an appearance for appel-
lant.

Sheldon M. Guttmann, Counsel, F. C. C.,
Washington, D. C., with whom Ashton R.
Hardy, Gen. Counsel, and Daniel M. Arm-
strong, Associate Gen. Counsel, F. C. C.,
Washington, D. C., were on the brief, for
appellee.

Samuel Miller, Washington, D. C., en-
tered an appearance for intervenor.

Before McGOWAN, ROBINSON and
WILKEY, Circuit Judges.

SPOTTSWOOD W. ROBINSON, III, Cir-
cuit Judge:

Faulkner Radio, Inc., appeals from an
order of the Federal Communications Com-
mission denying renewal of its license to
operate a radio station.[1] The challenge to
the Commission's decision is rested on sev-
eral grounds, including the claim that the

---

1. *Radio Carrollton*, 52 F.C.C.2d 1173 (1975).

Commission erred in attaching greater weight to the testimony of two parties who are lawyers, simply because they are lawyers, than to the testimony of opposing witnesses. We find that ground dispositive of the appeal, and remand the case to the Commission for reconsideration.

## I

On November 27, 1967, Radio Carrollton, a partnership consisting of two practicing attorneys, Hollis B. Johnson and William P. Johnson, filed an application for a permit to construct and operate a standard broadcast station in Carrollton, Georgia. Faulkner Radio, the licensee of Station WLBB, an existing standard broadcast facility in Carrollton, petitioned for denial of Radio Carrollton's application, questioning the applicant's financial and character qualifications as well as its ascertainment of community needs. Radio Carrollton's response tendered an affidavit by Hollis Johnson averring that Robert M. Thorburn, vice-president of Faulkner Radio, had admitted to him during a telephone conversation that the petition to deny had been filed for the purpose of delaying proceedings on the application. Thorburn, in turn, submitted a counter-affidavit disputing the substance of the statements attributed to him.

Over the next three years, there were numerous amendments to the application and supplements to the petition to deny. These generated additional character issues, and questions concerning the availability of an antenna site for Radio Carrollton and its compliance with the Commission's rules. Although Radio Carrollton's application for a construction permit and Radio Faulkner's later application for renewal of its license were not mutually exclusive from an engineering standpoint, and thus could both have been granted,[2] the Commission felt that the factual disputes "inextricably connect[ed] the applications" and consolidated them for a hearing "to permit an orderly resolution of the questions presented."[3] Among the issues which the Commission designated for hearing were:

. . . [W]hether Radio Carrollton has complied with the provisions of section 1.65 of the Commission's rules[4] by keeping the Commission advised of substantial and significant changes as required by section 1.65, and, if not, the effect of such noncompliance on its basic qualifications to be a Commission licensee.

. . . [W]hether Radio Carrollton misrepresented itself to the Commission pertaining to the availability of the land owned by O. S. Whitman as an antenna site, and if so, what effect such conduct has on the basic qualifications of Radio Carrollton to be a Commission licensee.

. . . [W]hether Faulkner Radio, Inc., filed its petition to deny for the purpose of delaying the processing of Radio Carrollton's application, and, if so, what effect such conduct has on the basic qualifications of Faulkner Radio, Inc., to be a Commission licensee. . . .

. . . [W]hether Faulkner Radio, Inc., or Radio Carrollton misrepresented itself to the Commission in its affidavit submitted concerning the conversation between Robert M. Thornburn [sic] and Hollis B. Johnson, and if so, what effect

---

2. When two or more applications for broadcasting licenses are mutually exclusive, they must be considered and resolved together; the Commission may not first grant one and then hear the other or others. *Ashbacker Radio Co. v. FCC*, 326 U.S. 327, 66 S.Ct. 148, 90 L.Ed. 108 (1945); *James River Broadcasting Corp. v. FCC*, 130 U.S.App.D.C. 210, 211, 399 F.2d 581, 582 (1968).

3. *Radio Carrollton*, 38 F.C.C.2d 68, 69 (1972).

4. Section 1.65 of the Commission's rules, 47 C.F.R. § 1.65 (1976), provides in relevant part:

Each applicant is responsible for the continuing accuracy and completeness of information furnished in a pending application or in Commission proceedings involving a pending application. Whenever the information furnished in the pending application is no longer substantially accurate and complete in all significant respects, the applicant shall as promptly as possible and in any event within 30 days, unless good cause is shown, amend or request the amendment of his application so as to furnish such additional or corrected information as may be appropriate.

such conduct has on the basic qualifications of either applicant to be a Commission licensee.

. . . [I]n light of the evidence adduced pursuant to the foregoing issues, whether a grant of the Radio Carrollton application and/or renewal of the Faulkner license would serve the public interest, convenience, and necessity.[5]

At the hearing, on May 14–16, 1973, before an administrative law judge, conflicting testimony was presented as to the content of the telephone conversation between Thorburn and Hollis Johnson. According to Johnson, Thorburn called and apologized for raising questions concerning Johnson's character, and said that because of Faulkner Radio's financial problems it needed to retard the granting of Radio Carrollton's application.[6] On the other hand, Thorburn maintained that the discussion occurred only in the context of his explanation to Johnson that the petition to deny probably would not lead to defeat of Radio Carrollton's application but rather to delay by several months. Thorburn further testified that he had not offered any apology for the attack on Johnson's character qualifications.[7]

Evidence concerning the availability of land owned by O. S. Whitman for an antenna site for Radio Carrollton was likewise contradictory. Thorburn submitted a document in the form of an affidavit signed by Whitman stating that he had informed the Johnsons that the property on which they held a by-then expired option would not be available for the antenna site.[8] That was significant because if Radio Carrollton knew that and did not notify the Commission thereof, it would have been guilty of misrepresentation and of violating the Commission's rules.[9] According to the Johnsons' testimony, however, Whitman had first told them that the land would be available despite expiration of the option,[10] and later had advised them that it might not be available but that he wanted to check with his son before he made any decision.[11] The Johnsons further claimed that they learned definitely that the land was not available only through the document brought forth by Thorburn.[12]

The parties also presented divergent testimony on Thorburn's role in the filing of a grievance by one Loyd Madden against Hollis Johnson with the local bar association.[13] Although the Commission had refused to designate this incident as a character issue, the administrative law judge allowed the testimony as relevant to Faulkner Radio's motive underlying the petition to deny.[14]

---

5. *Radio Carrollton, supra* note 3, 38 F.C.C.2d at 74–75.

6. Joint Appendix (J.App.) 135–137, 157–158, 162, 176–178; *Radio Carrollton,* 52 F.C.C.2d 1187, 1192 (1975).

7. J.App. 218–224, 346–350; *Radio Carrollton, supra* note 6, 52 F.C.C.2d at 1192–1193.

8. At the hearing, Thorburn testified that Whitman had not deposed before a notary and thus the document was not really an affidavit. He further testified that Whitman had not been sworn when he signed the document. J.App. 264–266.

9. See note 4 *supra.*

10. J.App. 75.

11. J.App. 77.

12. J.App. 126.

13. Thorburn claims that Hollis Johnson coerced Madden into signing a deed in payment for legal fees. Johnson denied any impropriety in the transaction. J.App. 181–185, 191–195, 204–208, 280, 352–363, 372–374, 382–385.

14. *Radio Carrollton, supra* note 6, 52 F.C.C.2d at 1200 n.14. The Commission declined to designate the matter as a character issue because neither the bar association's grievance committee nor the bankruptcy judge handling Madden's case had found impropriety on Johnson's part. *Radio Carrollton, supra* note 3, 38 F.C.C.2d at 70.

After the May, 1973, hearing, the Commission enlarged the issues on Faulkner Radio's petition, and further hearings were held on January 15–18, 1974, on the question whether one Al Cohen had a hidden one-third ownership interest in Radio Carrollton. *Radio Carrollton,* 43 F.C.C.2d 472, 475 (1973). The Johnsons denied that Cohen ever had any interest in the station, J.App. 84–87, 1113–1115, 1118–1123, 1133, 1138, 1143–1144, 1156, 1161–1163, 1171–

The judge released his decision on April 15, 1974, refusing to renew Faulkner Radio's license and granting Radio Carrollton's application for a construction permit.[15] The judge resolved all conflicts in the evidence against Faulkner Radio. He found that it had set out deliberately "to mislead and deceive this Commission concerning . . . Radio Carrollton, for the purpose of thwarting or delaying the initiation of a competing broadcast service in Carrollton, Georgia."[16] The judge further found that Faulkner Radio

was itself responsible for distortion of the facts in relation to the site availability matter; that the evidence is persuasive, as well as pervasive, regarding Mr. Thorburn's wanton disregard of, and indifference to, the need for accuracy and truth in giving testimony on the so-called Whitman site episode, as well as upon other matters; that it was at least circumstantially apparent that Faulkner, through Thorburn, tried, most irresponsibly, to stir up further enmity against the Johnsons by a disappointed former client of their law firm when Thorburn knew, or ought to have been aware, that the dispute with the client had previously been settled, by seeking, with the help of an "affidavit" and allegations in a pleading, to revive the subject before this Commission; and that the Hollis Johnson version of the crucial telephone conversation he had had with Thorburn on June 20, 1968 must be accepted as substantially accurate and therefore credible, while Thorburn must be held to have either been

reckless with the truth or to have wilfully misrepresented the facts in his version.[17]

Faulkner Radio filed exceptions to the decision. The Commission, after oral argument, affirmed, adopting substantially the administrative law judge's findings of fact.[18] Among the contentions in this court is Faulkner Radio's claim that the Commission's decision is pervasively infected by bias outwardly manifested by the judge during the hearing. One aspect of the alleged bias assertedly is the judge's assumption that the Commission indulges a presumption giving greater weight to the testimony of lawyers than that of persons pursuing other callings.[19] That the judge may have labored under that impression seems clear, for in his opinion he stated:

It may be said, finally, that there is nothing more precious and vital to a practicing lawyer than his "good name"; that the Johnsons evidently are attorneys of some distinction in Carrollton, Georgia; and that the Commission, thus, has at least a presumptive basis for preferring the veracity of Mr. Hollis Johnson's testimony over Mr. Thorburn's, absent a persuasive justification to the contrary.[20]

The Commission's decision indicates that it reviewed the record fully and makes plain that it concurred for the most part in the judge's determinations of fact. The Commission also indicated that absent an abuse of discretion by the judge, it would not substitute its judgment as to credibility of the witnesses for that expressed by the judge.[21] Consequently, if the judge erred

---

1187, as did Cohen, J.App. 981–1094. Faulkner Radio produced several witnesses who avowed that they were told that Cohen did have such an interest. J.App. 694–696, 756–793, 804–817.

**15.** *Radio Carrollton, supra* note 6.

**16.** *Radio Carrollton, supra* note 6, 52 F.C.C.2d at 1221.

**17.** *Radio Carrollton, supra* note 6, 52 F.C.C.2d at 1222.

**18.** *Radio Carrollton, supra* note 1, 52 F.C.C.2d at 1175.

**19.** Faulkner Radio also claims that the judge demonstrated bias against it by blaming it for

the delay in the handling of Radio Carrollton's application.

**20.** *Radio Carrollton, supra* note 6, 52 F.C.C.2d at 1223. The judge also found that Thorburn's testimony was marked with inconsistencies and evasiveness, which in the judge's view provided a basis for disbelieving his testimony. *Id.* We cannot be certain, however, that the judge would have reached the same conclusions with respect to credibility had he not decided to give preference to the testimony of the lawyer-parties.

**21.** *Radio Carrollton, supra* note 1, 52 F.C.C.2d at 1180.

by according superior weight to the veracity of the lawyer-witnesses solely because they are lawyers, the decision of the Commission incorporates that error. And the likelihood, though not absolute certainty, that the judge pursued a legally impermissible course demands at a minimum an administrative reevaluation of the evidence.

## II

■■■ Findings of fact by the Commission must be accepted by the courts when supported by substantial evidence in the record considered as a whole.[22] Beyond that, credibility resolutions by administrative law judges are entitled to great weight on judicial review of agency action.[23] Neither type of determination can stand, however, when predicated upon a material error of law.[24] We think that such an error inhered in the judge's treatment of the Johnsons' version of the disputed events if it was favored merely because they are lawyers. We think, too, that at the very least there is more than enough doubt on

that score to require a remand of this case to the Commission.

As Dean Wigmore has observed in a related context, "it can be said that there are no rules, in our system of Evidence, prescribing for the jury the precise effect of any general or special class of evidence."[25] And while the principles governing use of evidence in administrative tribunals are not wholly congruent with those obtaining in the courts,[26] administrative no less than judicial rulings must respect standards of reason and fair play.[27]

■■■ If the trier of fact automatically credits or repudiates testimony of a witness simply because he is one of a group pursuing a particular vocation, the normal burden of proof is in some wise altered, and arbitrarily so.[28] When one party's witness is preferred for that reason alone, the opposing party is summoned to produce additional evidence sufficient to overcome the presumptive weight bestowed upon that witness. And since membership in a general class may or may not reflect on an individual member's veracity,[29] there is neces-

22. Communications Act of 1934, ch. 652, § 402(e), 48 Stat. 1094, as amended, 47 U.S.C. § 402(e) (1970). See *FCC v. WOKO, Inc.*, 329 U.S. 223, 226, 67 S.Ct. 213, 215, 91 L.Ed. 204, 207 (1946); *Johnston Broadcasting Co. v. FCC*, 85 U.S.App.D.C. 40, 46, 175 F.2d 351, 357 (1949).

23. The power of administrative law judges to render initial decisions does not mean that the Commission is "relegated to the role of [a] reviewing court[ ] [which] sustain[s] fact finding of courts of first instance unless clearly erroneous." *Lorain Journal Co. v. FCC*, 122 U.S.App.D.C. 127, 131, 351 F.2d 824, 828 (1965) citing *FCC v. Allentown Broadcasting Corp.*, 349 U.S. 358, 364, 75 S.Ct. 855, 859, 99 L.Ed. 1147, 1154 (1955). The Commission's decision must be upheld when it is supported by substantial evidence in the record even if there is also substantial evidence to support the contrary decision of the judge. *Lorain Journal Co. v. FCC, supra.* The Commission also possesses authority to reject credibility assessments of the judge. *Cf. Retail, Wholesale & Dep't Store Union, AFL–CIO v. NLRB*, 151 U.S.App.D.C. 209, 215–216, 466 F.2d 380, 386–387 (1972).

24. See *Victor Prods. Corp. v. NLRB*, 93 U.S. App.D.C. 56, 59–60, 208 F.2d 834, 838–839 (1953); *Breeden v. Weinberger*, 493 F.2d 1002, 1010 (4th Cir. 1974). See also *D.C. Transit*

*Sys., Inc. v. Washington Metropolitan Area Transit Comm'n*, 151 U.S.App.D.C. 223, 243, 466 F.2d 394, 414, *cert. denied*, 409 U.S. 1086, 93 S.Ct. 688, 34 L.Ed.2d 673 (1972); *Jefferson Standard Broadcasting Co. v. FCC*, 305 F.Supp. 744, 748 (W.D.N.C.1969).

25. 1 J. Wigmore, Evidence § 26 at 401 (3d ed. 1940).

26. See generally 2 K. Davis, Administrative Law §§ 14.01 to 14.17 (1958).

27. See cases cited *supra* note 24.

28. As to the burden of proof in Commission proceedings, see § 309(e) of the Communications Act, 47 U.S.C. § 309(e) (1970).

29. The witness' occupation may in given situations be a factor bearing on his credibility. *Wilson v. State*, 31 Ala.App. 21, 11 So.2d 563, 566 (1942), *cert. denied*, 243 Ala. 671, 11 So.2d 568 (1943); *State v. Owen*, 73 Idaho 394, 253 P.2d 203, 208 (1953); *State v. Swisher*, 364 Mo. 157, 260 S.W.2d 6, 12 (1953). But the fact that the occupation is respectable—even exalted— does not of itself elevate the witness' testimony above that of any other reputable witness.

The profession of a preacher does not necessarily invest a man with that purity of morals

sarily an impingement upon the full and fair hearing that Congress has mandated [30] —"a hearing . . . essential for wise and just application of the authority of administrative boards and agencies." [31] We do not suggest, of course, that the discretion of administrative law judges or agencies in assessing credibility on the personal qualities of witnesses is in any way to be curtailed. We say only that by what seemingly was a class-presumption applied in this case, Faulkner Radio may have been deprived of an opportunity to have its evidence objectively considered.

The precise point we stress would appear to many as self-evident, and perhaps that explains why it apparently has not heretofore been squarely addressed in a reported decision. Nonetheless, we are not without support in precedent. In *Milton Broadcasting Co.*,[32] the Commission, in a license renewal proceeding, concluded that an administrative law judge had been influenced in

judging credibility by his sympathy for the poor physical condition of the owner of the licensee, and thereby had shifted the burden of proof from the licensee to the Commission's Broadcast Bureau.[33] Though indicating its reluctance to substitute its own findings on credibility for those of the judge, the Commission realized that it would be "derelict in [its] statutory duty" to accept findings by the judge which conflicted with evidence in the record.[34] To recite the *Milton* holding is not to intimate a view as to whether the judge's credibility resolutions here are unsupported by the evidence as in *Milton*. That decision is one for the Commission in the first instance.

We may look also to our own decisions requiring trial judges, on request, to inquire on voir dire examination of prospective jurors as to whether any of them would attribute more weight to the testimony of a police officer, just because he is a police officer, than they would give to the testimony of another witness.[35] "[W]hen impor-

---

which renders him more scrupulous in declaring the truth than another man; for it sometimes happens, that even the members of that sacred vocation are overpowered by the temptations to vice. That a witness is a preacher, ought, if proved, to be stated to the Jury, that they may judge how far that circumstance entitles his testimony to additional weight; but even then a Jury would draw their conclusions from his individual character, and its correspondence with his profession, rather than from the profession itself. The instruction given in this case can only be sanctioned by assuming the position, that a preacher *ex vi termini*, denotes a person whose evidence is entitled to greater weight than that of another man: whereas, a preacher whose life and profession are at variance, is less entitled to confidence than another man, since to his other vices he adds that of hyprocricy; and he who could impiously aim to deceive the Deity, would not scruple to mislead his creatures.
*Sneed v. Creath*, 8 N.C. 309, 312 (1821). Compare *Flynn ex rel. Chin King v. Tillinghast*, 32 F.2d 359, 360 (D.Mass.1929), *rev'd on other grounds*, 38 F.2d 5 (1st Cir.), *cert. denied*, 281 U.S. 768, 50 S.Ct. 467, 74 L.Ed. 1176 (1930) (race); *Bliss v. Bliss*, 161 Mo.App. 70, 142 S.W. 1081, 1082 (1912) (sex); *Barefoot v. Lee*, 168 N.C. 89, 83 S.E. 247, 248 (1914) (sex); *Texas Employers Ins. Ass'n v. Haywood*, 153 Tex. 242, 266 S.W.2d 856, 859 (1954) (race).

**30.** In § 309(e) of the Communications Act, 47 U.S.C. § 309(e) (1970), Congress provided for

hearings where "a substantial and material question of fact is presented or the Commission for any reason is unable to make the finding specified in" § 309(a)—that the public interest, convenience and necessity will be served by a grant of the application. The Supreme Court has held that in § 309(e) hearings "every party shall have the right to present his case or defense by oral or documentary evidence, to submit rebuttal evidence and to conduct such cross-examination as may be required for a full and true disclosure of the facts." *United States v. Storer Broadcasting Co.*, 351 U.S. 192, 202, 76 S.Ct. 763, 770, 100 L.Ed. 1081, 1090 (1956).

**31.** *Id.*

**32.** 34 F.C.C.2d 1036 (1972).

**33.** *Id.* at 1043–1045. In license renewal proceedings, the licensee shoulders the burden of proving that renewal is in the public interest. Communications Act of 1934, § 309(a), (e), 47 U.S.C. § 309(a), (e) (1970).

**34.** *Milton Broadcasting Co., supra* note 32, 34 F.C.C.2d at 1045.

**35.** *Salley v. United States*, 122 U.S.App.D.C. 359, 361, 353 F.2d 897, 899 (1965); *Brown v. United States*, 119 U.S.App.D.C. 203, 204–205, 338 F.2d 543, 544–545 (1964); *Sellers v. United States*, 106 U.S.App.D.C. 209, 210, 271 F.2d

tant testimony is anticipated from certain categories of witnesses, whose official or semi-official status is such that a juror might reasonably be more, or less, inclined to credit their testimony," we have said, "a query as to whether a juror would have such an inclination is not only appropriate but should be given if requested." [36] While those cases do not dictate specifically that jurors who answer in the affirmative must be excused for cause, that is the implication of the logic of the decision in those cases. We cannot believe that the result here should differ merely because the proceeding is civil in nature and the presumptive bias favors members of the bar instead of police officers.

We also draw support for our view from a comparatively recent case in the Third Circuit. In *United States v. Thompson*,[37] the court held that a judge was required to disqualify himself when it was averred that he was personally biased against a class of defendants—those convicted of violating the selective service laws. The defendant and his attorney had supplied pretrial affidavits charging that the judge had stated that it was his policy to "sentence all violators to thirty (30) months in prison if they are good people," and to four and a half years if they were black militants.[38] Deem-

ing this class bias, the court concluded that it was sufficient to call for recusal.[39] We recognize, of course, that disqualification of the judge was mandated by a statute not applicable here,[40] but that is beside the point. The fair hearing contemplated by Congress demands as much as the disqualification statute does; as we have declared,

> an administrative hearing [which is] of such importance and vast potential consequences must be attended, not only with every element of fairness but with the very appearance of complete fairness. Only thus can the tribunal conducting a quasi-adjudicatory proceeding meet the basic requirement of due process.[41]

In the case before us, the administrative law judge noted the undoubted value of a lawyer's "good name"[42] and the apparent fact that the Johnsons bore "some distinction" in Carrollton.[43] The judge did not limit these considerations to circumstantial interplay as factors pertinent to credibility, however, but ruled on the premise—which he attributed to the Commission—that there was "at least a presumptive basis for preferring the veracity of Mr. Hollis Johnson's testimony over Mr. Thorburn's, absent a persuasive justification to the contrary."[44] These pronouncements are

---

475, 476 (1959). Accord, *Chavez v. United States*, 258 F.2d 816, 819 (10th Cir. 1958), *cert. denied, sub nom. Tenorio v. United States*, 359 U.S. 916, 79 S.Ct. 592, 3 L.Ed.2d 577 (1959) (dictum).

**36.** *Brown v. United States, supra* note 35, 119 U.S.App.D.C. at 205, 338 F.2d at 545. We also noted that not every failure to put the question necessarily leads to reversal, but that "the issue turns on the degree of impact which the testimony in question would be likely to have had on the jury and what part such testimony played in the case as a whole." *Id.* Since in the present case the administrative law judge's decision depended on resolution of the conflicting testimony of the lawyer- and nonlawyer-witnesses, an announced preference for the veracity of lawyers' testimony would clearly constitute fundamental error.

**37.** 483 F.2d 527 (3d Cir. 1973).

**38.** *Id.* at 528.

**39.** *Id.* at 528–529. Since the court held that recusal was mandated by virtue of the alleged

bias against those convicted of violating the selective service laws, it did not reach the question whether recusal was also required because of claimed bias against black militants. *Id.*

**40.** 28 U.S.C. § 144 (1970) provides in pertinent part:

> Whenever a party to any proceeding in a district court makes and files a timely and sufficient affidavit that the judge before whom the matter is pending has a personal bias or prejudice either against him or in favor of any adverse party, such judge shall proceed no further therein, but another judge shall be assigned to hear such proceeding.

**41.** *Amos Treat & Co. v. SEC*, 113 U.S.App.D.C. 100, 107, 306 F.2d 260, 267 (1962).

**42.** See text *supra* at note 20.

**43.** See text *supra* at note 20.

**44.** See text *supra* at note 20.

certainly readable in combination as the expression of a view that the testimony of Hollis Johnson, a lawyer, was for that singular reason surrounded by a presumption entitling it to a preferred status over the testimony of a layman. At the bare minimum, one cannot say with even the slightest degree of confidence that the judge's ruling—which the Commission unreservedly adopted—was not bottomed on that predicate. Whichever way the judge's explanation is interpreted, then, a remand for reconsideration is necessary to assure that Faulkner Radio's evidence is evaluated without the impediment of a presumption of veracity indulged an opposing lawyer-witness solely because he happens to be a lawyer.

### III

Because the case must return to the Commission for new findings of fact, we feel compelled to make known, for guidance of the Commission, our concern as to the ambiguity of the Commission's findings with respect to motivation underlying Faulkner Radio's petition to deny, and with some of the implications of the Commission's discussion of strike petitions.

The Commission has heretofore held that where one of the purposes of a license application is "the obstructing, impeding, or delaying of a grant of another application," the former is a strike application and its filing "places in jeopardy the authorization for the existing station which is the intended beneficiary of the strike application." [45] The Commission has further stated that

> [t]his policy obtains even if the intention to obstruct, impede, or delay is not the

sole reason for participation and even if the strike applicant intends to build and operate the proposed station if his application is granted. [46]

In *Pressley v. FCC,* [47] we noted that "[t]hese words are not a model of clear and complete statement which will give adequate prior notice of a standard by which conduct can be measured," [48] and we called upon the Commission to develop regulations to provide guidance to licensees. [49] In response to our decision, the Commission identified an essential ingredient of strike applications. [50] "To be considered a 'strike' application," the Commission said, "the motive or purpose—principal or incidental—must be to obstruct or delay another application." [51] The Commission also set forth some criteria for determining whether an application is or is not a strike application: "(1) the timing of the application, (2) the economic and competitive benefit occurring from the application, (3) the good faith of the applicant, and (4) questions concerning a frequency study." [52]

Although these guidelines were established for use in evaluating applications, the Commission, starting with the instant case, has begun to utilize them to similarly evaluate petitions to deny. [53] The administrative law judge concluded that "Faulkner Radio, Inc. had filed its Petition to Deny, not for a praiseworthy purpose of bringing pertinent information concerning its adversary to the Commission's attention bearing on the public interest but instead for the invidious or underhanded purpose of delaying the processing of Radio Carrollton's application . . . ." [54] The Commission, in turn, applying the strike-application criteria to

---

**45.** *Asheboro Broadcasting Co.,* 20 F.C.C.2d 1, 3 (1969).

**46.** *Id.*

**47.** 141 U.S.App.D.C. 283, 437 F.2d 716 (1970).

**48.** *Id.* at 288 n.5, 437 F.2d at 721 n.5.

**49.** *Id.* at 288–289, 437 F.2d at 721–722.

**50.** *Grenco, Inc.,* 28 F.C.C.2d 166, 167 (1971).

**51.** *Id.*

**52.** *Id.*

**53.** *Radio Carrollton, supra* note 1, 52 F.C.C.2d at 1178. See, e. g., *State College Communications Corp.,* 58 F.C.C.2d 462 (1976); *Gill Indus.,* 56 F.C.C.2d 765, 769 (1975).

**54.** *Radio Carrollton, supra* note 6, 52 F.C.C.2d at 1223.

Faulkner Radio's petition, concluded that it was a strike petition.[55] More particularly, with respect to Faulkner's good faith, the Commission held:

(1) The Thorburn-Holey correspondence of May, 1968 indicates that Thorburn was then in fact contemplating a strike application. The fact he never filed such application is immaterial, for, as the Judge determined, such contemplation would indicate Thorburn's state of mind at the time as bent on delaying [Radio Carrollton's] application. (2) Also in May, 1968, Thorburn misrepresented to Whitman the supposed legal action the Johnsons contemplated respecting the antenna site, thereby securing Whitman's written statement adverse to the Johnsons.[56] But, the evidence shows, Whitman had not then actually declared the site unavailable. (3) The next month, Faulkner filed its petition to deny. Based on Thorburn's experience in filing a similar petition in the Slidell proceeding,[57] raising identical types of issues (*i. e.,* ascertainment of needs, financial and character) as those in the Carrollton petition, Faulkner knew or should have known the petition would probably delay [Radio Carrollton's] application considerably. And, as already mentioned, the character allegations of the petition centered about the Madden dispute, which Thorburn knew or should have known had already been settled.[58] (4) Hollis Johnson's version of the crucial

June 20, 1968 telephone conversation . . . attributed to Thorburn, *inter alia,* an account of Faulkner's financial difficulties and the unprofitability of radio ventures, and the statement that the petition to deny had been filed to obtain four or five months' delay.[59] (5) Thorburn then sought to obtain a non-competition covenant from Cohen, then a key employee of Faulkner in Carrollton.[60] This action plainly was designed to prevent [Radio Carrollton] from obtaining experienced staff in Carrollton should it receive a grant. (6) And finally, Thorburn apparently encouraged Madden to file a complaint against Hollis Johnson with the local bar grievance committee on which, as Faulkner itself points out, the committee advised Madden and the Commission it lacked authority to act.[61] The committee further informed Madden if he wanted to pursue the matter he should contact either the county grand jury or the Georgia State Bar. The presumed lack of any merit to Madden's grievance is indicated by the fact there is no evidence Madden ever did so.[62]

Assuming *arguendo* that these findings were bolstered by substantial evidence in the record,[63] they might support the conclusion that a substantial reason for presentation of the petition to deny was an illegitimate objective. But, the Commission, unlike the administrative law judge,[64] declined to specifically find that a purpose to im-

---

**55.** *Radio Carrollton, supra* note 1, 52 F.C.C.2d at 1178–1179. Although the Commission in another case has indicated, in discussing Faulkner Radio's petition, that one factor in its decision was the volume and timing of the seven supplements to Faulkner's petition, *Gill Indus., supra* note 53, 56 F.C.C.2d at 769, we note that the Commission declined to find in its decision on Faulkner's petition that the supplements were filed for the purpose of delay. *Radio Carrollton, supra* note 1, 52 F.C.C.2d at 1179 & n.14. That finding would seem necessary since the Commission held that most of Faulkner Radio's supplements came in response to amendments to Radio Carrollton's application. *Id.*

**56.** See text *supra* at notes 8–12.

**57.** One year before filing the petition to deny Radio Carrollton's application, Faulkner Radio

submitted a similar petition against an applicant for a Radio station in Slidell, Louisiana. J.App. 347.

**58.** See notes 13–14 *supra* and accompanying text.

**59.** See text *supra* at note 6.

**60.** See note 14 *supra.*

**61.** See note 14 *supra.*

**62.** *Radio Carrollton, supra* note 1, 52 F.C.C.2d at 1179.

**63.** See Part II *supra.*

**64.** See text *supra* at note 54.

pede, obstruct or delay was the primary or even a substantial reason for the filing of the petition. Relying on its strike-application policy, the Commission declared that

> the evidence clearly demonstrates Faulkner did file a strike petition. Plainly, one of Faulkner's purposes was to obstruct, impede and delay the grant of [Radio Carrollton's] application. It is unnecessary to find this was Faulkner's sole—or even primary—purpose in order . . . to put its license in jeopardy.[65]

Our concern stems from this refinement, which leaves open the possibility that a licensee jeopardizes its license when it tenders a petition to deny for bona fide public-interest reasons but it also has an incidental—perhaps even a distinctively minor—purpose to retard progress on another's application. Such a policy might well have a chilling effect on the submission of petitions to deny by competitors—those most likely to bring an applicant's deficiencies to the Commission's attention.[66] The Commission seemingly has recognized this difficulty since in a recent opinion designating for hearing the question of a licensee's motive in filing a petition to deny, it said:

> While we in no way intend to cast a chilling effect upon the filing of applications, petitions to deny or other pleadings by licensees against competitors or potential competitors, we will not hesitate to take appropriate and necessary action where information comes to our attention which indicates that a licensee may have

filed in bad faith—i. e., to block, impede or delay the grant of another application.[67]

We are not persuaded that the Commission will not "cast a chilling effect" if it fails to clarify the standard it will apply in evaluating petitions to deny. Nor are we satisfied that a chill is avoidable so long as the Commission proposes to penalize licensees on the basis of its analysis of their subsidiary motives. Congress has conferred standing upon interested parties to enable them to convey information bearing on the qualifications of licensees and potential licensees to the Commission.[68] Any policy which would seriously inhibit this vital flow of intelligence might be inconsistent with the congressional mandate, and injurious of the public interest as well.

A decision by the Commission subsequent to its disposition of this case, however, suggests that its intent may not be that an incidental motive to delay or impede will turn an otherwise bona fide, well grounded petition to deny into a strike petition. In *Gill Industries*,[69] the Commission refused to find an abuse of process, holding that "the mere existence of an ulterior economic motive in the filing of pleadings before this Commission is not sufficient to establish abuse of process without the exacerbating factors present in, e. g., *Radio Carrollton*. . . ."[70] The Commission took pains to describe the conduct of Faulkner Radio that resulted in its conclusion in the present case:

---

**65.** *Radio Carrollton, supra* note 1, 52 F.C.C.2d at 1180.

**66.** Competitors have been granted standing before the Commission and the courts because "such persons might well be the only ones sufficiently interested to contest a Commission action." *United Christ Church v. FCC,* 123 U.S.App.D.C. 328, 335, 359 F.2d 994, 1001 (1966) citing *FCC v. Sanders Bros. Radio Station,* 309 U.S. 470, 477, 60 S.Ct. 693, 698, 84 L.Ed. 869, 875 (1940). *Cf. Eastern R.R. Presidents Conference v. Noerr Motor Freight, Inc.,* 365 U.S. 127, 139, 81 S.Ct. 523, 530, 5 L.Ed.2d 464, 472 (1961) ("it is quite probably people with . . . a hope of personal advantage who provide much of the information upon which governments must act").

**67.** *State College Communications Corp., supra* note 53, 58 F.C.C.2d at 466.

**68.** See note 66 *supra.* *Cf.* Johnson & Dystel, *A Day in the Life: The Federal Communications Commission,* 82 Yale L.J. 1575, 1617 (1973).

**69.** *Supra* note 53.

**70.** *Gill Indus., supra* note 53, 56 F.C.C.2d at 769. The Commission may, however, be drawing a distinction between petitions filed for purposes of delay and those accompanied by other types of ulterior economic motive, since in *Gill* the Commission pointed out that there were no allegations that the petition there was prompted by any desire to delay.

[T]hat decision was based on, *inter alia,* the nature of the prosecution and delaying tactics as well as the petitioner's financial interest in preventing the institution of a competing service. . . . [Faulkner Radio's] tactics were designed to delay the proceeding, including unwarranted delay in the filing of petition to enlarge issues, filing of a false affidavit, attempts to stir up already settled local litigation, and attempts to convey a false impression.[71]

This characterization of Faulkner Radio's activities suggests that the Commission may have believed that illegitimate purposes associated with the presentation of the petition were substantial or even crucial, and that any service to the public interest was minimal. That rationalization is not supplied by the Commission's decision in this case, however, and thus cannot be considered on this review. On remand, the Commission will be well advised to clarify its policy on strike petitions and, if it finds Faulkner Radio's petition to be of that character, to specify the precise basis for that conclusion.

The order appealed from is vacated, and the case is remanded to the Commission for further proceedings in conformity with this opinion.

*Vacated and remanded.*

---

71. *Id.*