MUETZE, Respondent, vs. TUTEUR and another, Appellants.

*May 24 — June 21, 1890.*

LIBEL: APPEAL. *(1) Envelopes of association for collecting bad debts. (2) List of delinquent debtors. (3) Liability of member causing publication. (4-7) Evidence: Publication: Special damage: Reputation. (8) Instructions to jury: Immaterial error: Waiver. (9) Certificate to bill of exceptions.*

1. Envelopes addressed to a debtor and having printed thereon, in a manner calculated to attract special attention, the name of an association and the statement that it is *for collecting bad debts,* are libelous, and the sending of such envelopes through the mails is a sufficient publication.

2. A list of delinquent debtors, published by an association for collecting bad debts and sent to all its members throughout the United States and Canada, is not a privileged communication. The printing of a person's name in such list is libelous, and the distribution of a book containing the list among the members of the association is a sufficient publication.

3. A member of the association who caused the sending of such envelopes and the printing of the name in such list, is responsible for the libel.

4. It being stated in the book containing such list that it is placed in the hands of all members of the association, and such book being in the hands of one member, who refused to give credit to a person whose name was in the list, the presumption is that the book was distributed as stated.

5. In an action for the libel by the person to whom credit was refused, the plaintiff was properly allowed to testify that the person refusing him credit exhibited such book to him.

6. In such action it was sufficient to show that the plaintiff was refused credit on account of the book, without showing that the person refusing the credit had ever trusted him or would have trusted him but for the book.

7. In such action the plaintiff could not properly be asked how many persons he owed besides the defendant. His general character or reputation only could be shown.

8. A statement in the charge to the jury that "the evidence shows *three* letters, I think, were mailed," etc., when there were in fact but *two,* is *held* not a material error. In such a case counsel should suggest the correction of the error at the time; otherwise it will be deemed to have been waived.

9. A certificate to a bill of exceptions regularly signed by the judge, that "the above and foregoing was and is all the testimony given on the trial of the above-entitled action," is sufficient.

APPEAL from the Circuit Court for *La Crosse* County.

Action for a libel. The facts are stated in the opinion. The defendants appeal from a judgment in favor of the plaintiff.

For the appellants there was a brief by *Losey & Woodward,* and oral argument by *G. M. Woodward.* To the point that the publication in the book was privileged, they cited *King v. Patterson,* 49 N. J. Law, 417, dissenting opinion; *State ex rel. Lanning v. Lonsdale,* 48 Wis. 369; *Locke v. Bradstreet Co.* 22 Fed. Rep. 773; *Missouri Pac. R. Co. v. Richmond,* 73 Tex. 568.

*E. C. Higbee,* for the respondent, argued, among other things, that the communications were libelous *per se. Woodling v. Knickerbocker,* 31 Minn. 268; *Bradley v. Cramer,* 59 Wis. 309; *Dennis v. Johnson,* 42 Minn. 301; Townsh. Sland. & Lib. (4th ed.), secs. 191, 192; *Brown v. Smith,* 13 C. B. 596; *Williams v. Davenport,* 42 Minn. 393; *Johnson v. Comm.* 14 Atl. Rep. (Pa.), 425; *Beals v. Thompson,* 149 Mass. 405. They were not privileged. *Cochran v. Melendy,* 59 Wis. 207; *King v. Patterson,* 49 N. J. Law, 417; *Montgomery v. Knox,* 23 Fla. 595; *Lynch v. Febiger,* 39 La. Ann. 336; *Byam v. Collins,* 111 N. Y. 143.

ORTON, J. This action is for libel, and the plaintiff re-
covered $571. The facts are substantially as follows:

The plaintiff is a jeweler by trade, but at one time kept
a saloon, and traded with the defendants, who were mer-
chants in goods suitable to the saloon business; and finally,
up to July, 1883, there was a balance of account against
the plaintiff, which the defendants claimed amounted to
the sum of $23.13, but the plaintiff claimed it to be much
less than that amount. There was an association, with its
central office at Chicago, called "The United States and
Canada Dealers' Protective and Detective Association,"
claimed to have been incorporated under the laws of Illi-
nois (but which had not been), the object of which is stated
on an envelope used by it to inclose correspondence by
mail to be "an organization of business and professional
men *for collecting bad debts.*" The answer in respect to
the association is as follows: "These defendants admit that
they were members of an association known [as above de-
scribed], and allege that the same is organized for the pur-
pose of protecting dealers giving credit against worthless
debtors, and against those who contract debts and do not
pay; and for the further purpose of communicating to the
members of such association, for their mutual protection
and safety, the names of all persons against whom unset-
tled claims remain outstanding and unpaid in favor of mem-
bers of said association, and which names have been reported
by members to the central office, after having taken the
necessary steps required by the rules of said association to
be taken by the members thereof before reporting such
names in order to give the debtor ample and full notice
thereof and ample opportunity to settle all claims and avoid
such report; that the said association publishes a book at
regular intervals giving the names of all persons so reported
by members, and against whom there are unsettled claims
in favor of members; . . . that said book is distributed

only to members of the association, and to no one else whatsoever, and all communications made by any member to said association, or by said association to any of its members, are strictly confidential and secret, for the purpose of their mutual protection and security."

On February 9, 1888, the defendant sent to the plaintiff, at La Crosse, one of the letters of said association, headed by its regular designation, signed by the firm of *Isaac Tuteur & Son*, in which they say that they have become members of such association, and then state its general purposes, and ask the plaintiff to call and settle, or they shall be obliged to report his name to the association before February 18th, "after which date *their matter goes to press.*" On said 18th day of February the plaintiff received another letter through the mail, with a similar heading, and signed "Agent," in which it is said: "*I. Tuteur & Son*, one of the members of our association, informs me that you have received our association letter in regard to your indebtedness, and that you have failed to respond. Now, before reporting your name to the main office for publication, allow me to inform you as to some of the consequences of being published in this manner as a delinquent." The letter then states the consequences as above stated, and that if the plaintiff did not wish his name so published he must by all means call on the defendants and make some satisfactory arrangement in regard to the claim on or before the 29th day of February, or his name would go forward to the main office.

On March 1st another letter was written to the plaintiff, dated at Chicago, stating that the defendants, a member of the association, informed them about the claim, and that reasonable time had been given him to pay it, and notifying him that if he did not pay by March 15th the consequences would be as previously threatened. This letter, with a similar heading, was signed by C. R. Collin as sec-

retary.  Another letter was written from Chicago, dated March 10th, notifying plaintiff to make immediate payment of the claim within twenty days, and another one dated Chicago, June 10, 1888, with a similar notice to pay within ten days.  These two last letters were inclosed in an envelope, respectively, and passed through the mail to plaintiff in La Crosse, and the envelope was indorsed as follows: "Return in twenty days to the United States and Canada Protective and Detective Association, an organization of business and professional men *for collecting bad debts.*  Central office, 139 Madison Street, Chicago.  For *Paul Muetze,* La Crosse, Wis."  Each of these letters or notices was also headed, "Main Office Notice."  There were two other letters received by plaintiff from the main office at Chicago,— the first dated August 10th, and the other September 12th; the first notifying plaintiff to pay within twenty days, and the other within eighteen days, inclosed in similar envelopes, excepting the clause, "for collecting bad debts," which is omitted.  The envelope containing this clause, "collecting bad debts," is of red paper, and these words are in very large type, so as to attract special attention.

After these communications, the plaintiff applied to a Mr. Borreson, a jeweler of La Crosse, for whom he had at one time worked, for credit, or to be trusted for a small amount, and he refused on account of his having received a book of said association containing the name of the plaintiff as a person unworthy of credit.  The book was issued July 1, 1888, and contains the plaintiff's name among many others in various parts of the United States.  In a preface to the book, addressed to members, it is stated that the association "is not a collection agency  .   .   .   *but uses its influence to make your debtor pay you.*"  When the debtor paid the claim, his name was taken out of the book.  As stated in the answer, the debtor is given an opportunity to pay, if he

will, before his name is inserted in the book. The several letters are so many threats that the plaintiff's name will be so published if he fails to pay. The defendants had demanded $23.13, and the letters make the same demand; but the defendant admitted, as a witness, that he had made a mistake of $3.05 in the account, and that the claim was only $20.07.

I have stated the facts more fully and explicitly in order to show what are the objects of the association. It is claimed by the learned counsel of the appellants that its purposes were right and honorable, like a railroad company that issued a pamphlet containing the names of its discharged employees, to be circulated among other companies, or commercial agencies and the like, for mutual protection against unworthy persons. The envelope of two letters from Chicago contains a distinct libel in itself, which could have been read, and probably was read, by many persons not members of the association. They are made to attract special attention, and publish the fact that the association was in correspondence with the plaintiff for the purpose of collecting *a bad debt* of him, and implies that he is a bad debtor who fails or refuses to pay his honest debts, and that he is unworthy of credit. But this is not all. It is also a public statement that the object and purpose of the association are for " collecting bad debts." The several letters were written and sent to the plaintiff, and such letters are no doubt sent to others to collect bad debts; and, if they fail to pay, their names are published in the book also for the purpose of collecting bad debts, for, as soon as payment is made, the publication of their names is discontinued. They are then published in a list of those who have settled up. In the book in evidence there is such a list of those whose credit is restored by their having paid up their bad debts. The object is not to protect the members from trusting this class of debtors, but to aid them in coercing

payment. This book of the association, with its list of delinquent debtors, is the pillory or punishment threatened and to be endured if they do not pay and until they pay their debts, and then they are discharged. This object is too apparent to be disguised. Why write so many letters, or why write at all, to the debtors, if the object be to publish to the members a list of delinquent debtors, or of persons unworthy of credit, to protect them against trusting them? After a debtor has been thus coerced into reluctant payment, he is no more worthy of credit than he was before. Why discontinue his name among the bad debtors, and place it among those who pay their debts? They say, in their address to the members, "it is to make your debtor *pay up*." It follows that the members, to whom this publication is sent in book form, are not interested in it in any other way than to make their own debtors pay up.

The communications of this association are not only libelous and not privileged, but they would seem to constitute the offense of "threatening communications," as defined in sec. 4380, R. S. The complications of this peculiar association, to bring it within the protection of the law, make it difficult to treat less briefly. As we now understand the real character of this association and of its publications, we may apply the law involved in the various exceptions.

1. Was it error to allow the plaintiff to testify that Borreson exhibited the book to him? The learned counsel of the appellant contends that such act could not constitute a libel or publication of a libel, and that the defendants cannot be charged with the responsibility for Borreson's violation of his obligation to keep the names in the book confidential. Probably not, and yet the plaintiff had the right to find out, if he could, why Borreson would not trust him; and it was certainly proper for him to prove, if he could, that it was on account of this publication.

2. Was it error to sustain the plaintiff's objection to the question put to him on cross-examination: "How many men in this city did you owe besides *Tuteur?*" The object of this question must have been to justify or mitigate the libel by showing that the plaintiff had no credit or character for trustworthiness that could suffer by it. There is no principle better settled than that in such cases specific acts cannot be shown, and that it is a question of general character or reputation alone. *Wilson v. Noonan*, 27 Wis. 598; *Campbell v. Campbell*, 54 Wis. 90.

3. Was it error to overrule the motion for a nonsuit? It is contended that the letters of the defendant to the plaintiff were not in themselves libelous, and that the other letters sent to him from Chicago were not, and that the defendants were not shown to be responsible for them, and that there was nothing in the book that imputed any bad character to the plaintiff as being unworthy of credit, and that there was no evidence that any other copy of the book, except the one received by Borreson, had been sent to any one, and, finally, that the envelopes inclosing two of the letters, containing the words, "for collecting bad debts," were not libelous.

The letters were not libelous in themselves, but the defendants' letters were proper to show their connection with the association as one of its members, and with its proceedings against the plaintiff. The defendants set in operation the whole scheme, and caused the other letters to be written and sent to the plaintiff, and they were sent for them and in their behalf. It was through the agency of the association and its officers that all the communications were made to the plaintiff, and finally his name placed in the bad debtor list in the book of the association, and the defendants were directly responsible for all that was done.

The learned counsel contends that the two envelopes containing the words, "for collecting bad debts," were not

only not libelous, but a mere violation of the laws of the
post office department, and which were changed as soon as
it was decided about that time that it was an offense against
the postal laws of the United States. Was it not decided
that it was an offense because the words were abusive and
libelous? There certainly could not have been any other
reason. But I have already shown that the words imputed
to the plaintiff a bad character and a want of credit, which
implied that he was a cheat and a swindler and that the
correspondence inclosed was for the purpose of collecting
from him a bad debt.

The book itself claims that they have members all over
the country, in whose hands the book is placed; and if
Borreson had one it was strong evidence that all the mem-
bers were supplied with it. At least, such would be the
presumption of fact from the declared intention of the as-
sociation. The plaintiff was notified and threatened in the
letter signed by Collin, the secretary, that if he did not pay
up by the 15th day of March, 1888, he would be published
in their "list of delinquent debtors, *which will be delivered
to all members of the association in the United States and
Canada.*" The sending through the mail of those en-
velopes with such an imputation of dishonesty, and the
distribution of the book among the members with the
plaintiff's name in the black-list of bad debtors, constituted
sufficient publication of the libel. The effect as well as
the intention of these libels was to discredit and disgrace
the plaintiff among business men; and this was the punish-
ment threatened if he did not pay as ordered. If it would
work no injury to the delinquent, it would not operate as
an inducement for him to pay up.

It is claimed that no special damage to the plaintiff was
proved by Borreson refusing to trust him for a small bill of
jewelry, because it was not shown that Borreson had ever
trusted him, or would have trusted him but for the book.

It is sufficient if Borreson refused him credit on account of the book, and the question of special damages was for the jury.   This disposes of the reasons urged in support of the defendants' motion for a nonsuit, and also in support of the motion that the court direct the jury to find for the defendants.

4. Errors are assigned on certain instructions to the jury. The learned circuit judge said to the jury: "The evidence shows that *three* letters, I think, were mailed from La Crosse by the defendants, of this character."   The learned counsel claims that this error of fact was very injurious to the defendants, because it would imply that all three of such letters were inclosed in that offensive envelope, when in fact there were only two of such letters.   The jury would probably recollect that there were only two of such envelopes, whether they should be misinformed as to the number of letters or not.   The statement was not positive, but made rather inquiringly by the qualification, "I think." In such a case, where the court mistakes the evidence in this way from the want of a distinct recollection of it, it is the duty of the counsel to suggest its correction at once, and not silently reserve it for a future exception.   He owes this duty to the court.   It is not an error of law.   We may presume that the jury remembered the evidence for itself, and we cannot presume that they were at all affected by this mistake. The counsel, in such a case, should be held to have waived the error by his silence when he ought to have spoken.   It is not very material any way, and should be disregarded.

The learned judge instructed the jury, in substance, that the communication would not be privileged if made to persons not interested in knowing the standing of the plaintiff; for instance the members in Canada.   This instruction presupposes that the communication was privileged so far as the members were concerned who had an interest in know-

Muetze vs. Tuteur and another.

ing the standing of the plaintiff. This did the defendants no harm, for most clearly the jury correctly found that it was not privileged, and this question was submitted to them by the court. We have seen that there was no object or purpose of the association to protect or serve any one except the creditor interested in collecting the debt. The authorities cited by the learned counsel have no application to such a case. There can be no question but that the communications were grossly libelous. On this general question, see the authorities cited in the brief of the learned counsel of the respondent. In speaking further on the question whether the matter was privileged, the learned judge said to the jury: "Whether it was a communication that was desired, well, there is no evidence that it was desired by anybody." This is a little obscure, but its meaning was, probably, that no one was interested in the matter except the defendants, and that no one else had any reason to desire it. The jury could not have been materially misled by it, whatever it might mean.

The verdict is not excessive.

The respondent's counsel omitted to argue these various exceptions, because he insisted that the certificate to the bill of exceptions is insufficient to make them a part of the record. The certificate is that "the above and foregoing was and is all the testimony given on the trial of the above-entitled action." But the bill of exceptions is regularly signed by the judge, as the law requires, and thereby became a part of the record (sec. 2873, R. S.), and it contains all the exceptions and the matters to which they relate. That is sufficient. What it contains need not be stated in the certificate, except whether it contains all the evidence. The objection is too technical.

We can find no error in the record.

*By the Court.*— The judgment of the circuit court is affirmed.