UNITED STATES, Appellee,

v.

Michael E. TOMCHEK, Specialist Four,
U. S. Army, Appellant.

No. 32,453.
SPCM 11060.

U. S. Court of Military Appeals.

Dec. 19, 1977.

*Captain Derryl W. Peden* argued the cause for Appellant, Accused. With him on the brief were *Colonel Alton H. Harvey, Captain John C. Carr,* and *Captain Michael B. Dinning.*

*Captain Gary F. Thorne* argued the cause for Appellee, United States. With him on the brief were *Colonel Thomas H. Davis, Lieutenant Colonel Donald W. Hansen, Major John T. Sherwood, Jr., Major Steven M. Werner,* and *Captain William C. Kirk.*

### Opinion of the Court

PERRY, Judge:

The appellant was convicted by special court-martial of disobeying the order of a commissioned officer, striking a commissioned officer, and assaulting a noncommissioned officer in violation of Articles 90 and 91, Uniform Code of Military Justice, 10 U.S.C. §§ 890 and 891. He was sentenced to a bad-conduct discharge, forfeiture of $150 pay per month for 3 months, and confinement at hard labor for 3 months. The United States Army Court of Military Review set aside the punitive discharge but affirmed the findings and the sentence as modified. *United States v. Tomchek,* 2 M.J. 813 (1976). We granted review to consider the appellant's claim that the trial judge erred in permitting another judge to testify to the appellant's bad character and reputation for truth and veracity. Upon consideration of the arguments regarding this claim, we conclude that it was prejudicial error to permit the witness to so testify. Accordingly, we reverse.

### I

The appellant's court-martial arose from a domestic dispute with his wife, a member of the Women's Army Corps, which occurred on October 16, 1974, at her office in the Defense Investigative Service at Fort Gordon, Georgia. The officer in charge of the office allegedly ordered the appellant to

leave and an altercation ensued between the appellant, the officer, and two sergeants. Thereafter, the instant charges were preferred.

Captain Karlson was originally scheduled to preside as military judge at the trial. However, upon receipt of the convening order, he recognized that he knew the appellant and the other parties to the incident and immediately recused himself. He thereupon informed the trial counsel of what he knew concerning the appellant. He further indicated his willingness to testify as a witness for the Government.

■■■■ At his trial held on December 20, 1974, the appellant testified in his own behalf concerning the events which precipitated the charges. However, he did not bring forth any evidence expressly regarding his character or reputation for truth and veracity.[1] After the defense rested its case, the prosecution called three rebuttal witnesses, including Captain Karlson, who was permitted to testify concerning the appellant's bad reputation for truth and veracity in a social setting in which appellant and his wife were sometimes involved. He also testified that the appellant had two courts-martial convictions. The appellant's counsel made several objections to Captain Karlson's testimony, most of which were overruled by the trial judge.

## II

Before this Court, the appellant urges that Captain Karlson voluntarily appeared as an adverse character witness in violation of Canon 2 B of the American Bar Association Code of Judicial Conduct which provides that a judge "should not testify voluntarily as a character witness." The commentary which accompanies the canon explains the provision as follows:

The testimony of a judge as a character witness injects the prestige of his office into the proceeding in which he testifies and may be misunderstood to be an official testimonial. This Canon, however, does not afford him a privilege against testifying in response to an official summons.

The Code of Judicial Conduct and the Code of Professional Responsibility of the American Bar Association have been made applicable to Army judges and lawyers involved in courts-martial proceedings.[2]

The Army Court of Military Review resolved the issue by assuming that the witness had some choice and that he testified in violation of the canons.[3] Upon that assumption, the court proceeded to find that there was no prejudice. The court observed that the witness was competent to testify and that his testimony was not violative of any legally enforceable rights of the appellant.[4] Additionally, said the court, no undue consideration was given the fact that

---

1. Character is said to have two features relevant to testimonial credibility: (1) general moral character, and (2) veracity. Under the Federal Rules of Evidence, proof of both, where relevant, is established by reputation and opinion. See Fed.R.Evid. 608. An accused on trial does not, by testifying, place his general moral character in issue. However, he may do so by testifying or otherwise offering evidence that his character is good. See the text and authorities set forth *infra* at footnotes 12–17. Conversely, when an accused testifies, his credibility like that of other witnesses, becomes an issue. *See* Manual for Courts-Martial, United States, 1969 (Revised edition), paragraphs 138, 149 and 153. *See also* Fed.R.Evid. 404(a)(1). A full discussion of the principles which govern the use of character evidence against an accused is contained in Part III of this opinion. For an excellent discussion of the subject, *see* Lawson, 50 Notre Dame Lawyer 758.

2. Army Regulation 27–10, paragraph 2–32.

3. 2 M.J. at 814 where the court stated, "We focus on the central issue of possible prejudice to the appellant by assuming that the witness had some choice and testified in violation of the canons cited above . . ." However, the basis of this assumption consists of affidavits which the Court of Military Review was "reluctant" to accept as the sole basis for a decision on this "ethical issue." I consider that view to be correct. This means there is no factual determination on this aspect of the case, so we are powerless to fill in the gap. *See United States v. Lowry,* 25 U.S.C.M.A. 85, 54 C.M.R. 85, 2 M.J. 55 (1976).

4. *Id.*

the witness was a judge and, moreover, he was treated by all the parties as any other witness.

Review of the testimony reveals that the first question the trial counsel asked Captain Karlson during his direct examination was "What is your position here at Fort Gordon?", to which the witness replied, "Military Judge." He then proceeded to testify in response to further questions concerning the numerous occasions he (Captain Karlson) had been in the appellant's presence in the military community and at social gatherings, and that he was generally aware of the appellant's reputation in the community as that of "an individual that cannot be believed." Captain Karlson gave no testimony on the merits of the charge for which the appellant was being tried and did not rebut any evidence that had been presented by the defense. One can only assume from these circumstances that the motivation for his appearance as a witness for the prosecution was his status as a judge. The questions propounded to him by the trial counsel and his answers leave no doubt that the witness' identity as a judge was of primary consideration and concern. Therefore, we are unable to agree with the Court of Military Review that no undue consideration was given the fact that the witness was a judge. Conversely, we perceive that there is ample reason to believe that the witness' status was emphasized. Determination of the relevant facts required the presiding judge as the trier of the facts to resolve the sharp testimonial conflicts that existed between the Government's witnesses and the appellant. To do that he had to decide upon the credibility of those witnesses. The appearance of a military judge as a Government witness on the issue of the appellant's veracity unfairly enhanced the Government's attack upon appellant's credibility.[5]

■ Where the trier of fact automatically credits or repudiates testimony of a witness merely because he is one of a group consisting of a particular profession or official status, the normal burden of proof is at least partially altered, and arbitrarily so.[6] When one party's witness is preferred for that reason alone, the opposing party is summoned to produce additional evidence sufficient to overcome the presumptive weight bestowed upon that witness. Membership in a general class is perceived by many to reflect on an individual member's veracity.[7] While a witness' membership in

---

5. *See* Manual, *supra,* paragraph 138*f*(2).

6. *Faulkner Radio v. Federal Communications Commission et al.,* 557 F.2d 866, 870 (D.C.Cir., 1977).

7. *Id.;* "*Wilson v. State,* 31 Ala.App. 21, 11 So.2d 563, 566 (1942), *cert. denied,* 243 Ala. 671, 11 So.2d 568 (1943); *State v. Owen,* 73 Idaho 394, 253 P.2d 203, 208 (1953); *State v. Swisher,* 364 Mo. 157, 260 S.W.2d 6, 12 (1953). But the fact that the occupation is respectable—even exalted—does not of itself elevate the witness' testimony above that of any other reputable witness.

'The profession of a preacher does not necessarily invest a man with that purity of morals which renders him more scrupulous in declaring the truth than another man; for it sometimes happens, that even the members of that sacred vocation are overpowered by the temptations to vice. That a witness is a preacher, ought, if proved, to be stated to the Jury, that they may judge how far that circumstance entitles his testimony to additional weight; but even then a Jury would draw their conclusions from this individual character, and its correspondence with his profession, rather than from the profession itself. The instruction given in this case can only be sanctioned by assuming the position, that a preacher *ex vi termini,* denotes a person whose evidence is entitled to greater weight than that of another man: whereas, a preacher whose life and profession are at variance, is less entitled to confidence than another man, since to his other vices he adds that of hyprocrisy; and he who could impiously aim to deceive the Deity, would not scruple to mislead his creatures.' *Snead v. Creath,* 8 N.C. 309, 312 (1821). Compare *Flynn ex rel. Chin King v. Tillinghast,* 32 F.2d 359, 360 (D.Mass.1929), *rev'd on other grounds,* 38 F.2d 5 (1st Cir.), *cert. denied,* 281 U.S. 768, 50 S.Ct. 467, 74 L.Ed. 1176 (1930) (race); *Bliss v. Bliss,* 161 Mo.App. 70, 142 S.W. 1081, 1082 (1912) (sex); *Barefoot v. Lee,* 168 N.C. 89, 83 S.E. 247, 248 (1914) (sex); *Texas Employers Ins. Assn. v. Haywood,* 153 Tex. 242, 266 S.W.2d 856, 859 (1954) (race)." *Id.* at 870–71 n. 29.

a general class does not *ipso facto* render him more or less credible,[8] care should be taken to avoid the tendency to accord more weight to such testimony than would be accorded the testimony of other witnesses.[9] The prohibition against a judge's voluntary appearance as a character witness is undoubtedly grounded upon a fact that we judicially know—that a judge's involvement with the administration of justice elevates him to a unique status in the minds of factfinders who must judge his credibility. The emphasis given his status as a judge quite likely turned any effort by the trier of fact to separate the "judge" from the "individual" into an exercise in futility, all to the detriment of the appellant.[10]

We do agree, however, that Captain Karlson would be competent to testify as an individual provided no rule prohibited his doing so and provided he had relevant and legally admissible testimony to give. Since the Court of Military Review merely assumed rather than decided that he had some choice and therefore testified in violation of the canons, this aspect of the matter need not be reached in view of the absence of any factual determination thereon. *See United States v. Lowry*, 25 U.S.C.M.A. 85, 54 C.M.R. 85, 2 M.J. 55 (1976).

### III

We proceed now to consider another problem concerning Captain Karlson's testimony. The appellant testified in his defense and gave his version of the events which precipitated the charges.[11] However, neither the appellant nor any other witness testified that his character or reputation for truth and veracity was good. Yet, under the guise of rebuttal, the Government was permitted, through Captain Karlson's testimony, to inject those issues into the trial. Under the circumstances, we conclude that this was improper.

In the trial of criminal cases, the character of the accused is not a fact in issue and the prosecution may not, for the purpose of inducing belief concerning his guilt, introduce evidence in its case-in-chief tending to show his bad character or reputation.[12] This does not mean that the law clothes the accused with a presumption of

---

8. *Id.*

9. It is proper that a trial judge, on request, inquire on *voir dire* examination of prospective jurors as to whether any of them would attribute more weight to the testimony of a police officer just because he is a police officer, than they would give to the testimony of other witnesses. *Salley v. United States*, 122 U.S.App. D.C. 359, 353 F.2d 897 (1965); *Chavez v. United States*, 258 F.2d 816 (10th Cir. 1958), *cert. denied sub nom. Tenorio v. United States*, 359 U.S. 916, 79 S.Ct. 592, 3 L.Ed.2d 577 (1959). Jurors indicating such a preference should be excused for cause. *See also United States v. Thompson*, 483 F.2d 527 (3rd Cir. 1973) in which a judge was required to disqualify himself when it was alleged that he was personally biased against a class of defendants—those convicted of violating the selective service laws. The defendant and his attorney had supplied pretrial affidavits charging that the judge had stated that it was his policy to "sentence all violators to thirty (30) months in prison if they are good people," and to four and a half years if they were black militants.

10. Though not appearing in the record, it is more likely than not that the presiding judge and Captain Karlson were at least professional acquaintances, since they were both serving in the capacity of military judges at Fort Gordon, Georgia.

11. The appellant testified that all his money was deposited in a joint checking account and that he went to the office where his wife worked to obtain more checks from his wife who had possession of the checkbook. Because of marital discord between them, she refused to talk with him privately. Physical intervention by male personnel in the office resulted in the altercation which precipitated the charges in this case.

12. *Michelson v. United States*, 335 U.S. 469, 69 S.Ct. 213, 93 L.Ed. 168 (1948); *Williams v. United States*, 168 U.S. 382, 18 S.Ct. 92, 42 L.Ed. 509 (1897); *Hurst v. United States*, 337 F.2d 678 (5th Cir. 1964); *Hargett v. United States*, 183 F.2d 859 (5th Cir. 1950); *Spaulding v. United States*, 279 F.2d 65 (9th Cir. 1960), *cert. denied*, 364 U.S. 887, 81 S.Ct. 177, 5 L.Ed.2d 107 (1960); *United States v. Reed*, 376 F.2d 226 (7th Cir. 1967) *cert. denied*, 393 U.S. 984, 89 S.Ct. 457, 21 L.Ed.2d 445 (1968); Manual, *supra*, paragraph 138*f*(2); Fed.R.Evid. 404(a)(1).

good character or reputation.[13] The rule merely forecloses "the whole matter of character, disposition, and reputation [from] the prosecution's case-in-chief."[14] Evidence of bad character and reputation is not rejected because it is irrelevant but because it may "weigh too [heavily] with the jury and to so overpersuade them as to prejudge one with a bad general record and deny him a fair opportunity to defend against a particular charge."[15] Exclusion of such evidence is an expression of policy "to prevent confusion of issues, unfair surprise, and undue prejudice."[16]

While the prosecution may not open an inquiry concerning the accused's general character or reputation, the accused himself may do so. He may introduce testimony that he is of good character and "that the general estimate of his character is so favorable that the jury may infer that he would not be likely to commit the offense charged." The United States Supreme Court "has held that such testimony alone, in some circumstances, may be enough to raise a reasonable doubt of guilt and that in the federal courts, a jury in a proper case should be so instructed."[17] When the accused chooses to place his general character in issue by offering testimony that he is of good character, the prosecution may (1) attempt to impeach the accused and his witnesses through proper cross-examination and (2) offer rebuttal evidence that the accused is of bad character, if such is available.[18] As the Supreme Court reminded us in *Michelson v. United States*, 335 U.S. 469, 69 S.Ct. 213, 93 L.Ed. 168 '(1948), "[t]he price a defendant must pay for attempting to prove his good name is to throw open the entire subject which the law has kept closed for his benefit and to make himself vulnerable where the law otherwise shields him."[19] That the prosecution may rebut the accused's evidence of general good character is not a relaxation of the rule prohibiting such evidence of bad character by the prosecution in its case-in-chief. It is merely a right accorded to the Government to refute the accused's claim that he is of good character and reputation,[20] for "[o]therwise, a defendant, secure from refutation, would have too clear a license unscrupulously to impose a false character upon the tribunal."[21]

What we have said concerning evidence of bad character[22] is applicable to credibility and reputation for truth and veracity, except that credibility is always an issue whether specifically raised by the accused or not.[23] An accused is not required to testify in his defense and his failure to do so may not be the basis for any inference against him.[24] But where he does elect to testify, as did this appellant, his credibility may be impeached like that of other wit-

---

**13.** *Greer v. United States*, 245 U.S. 559, 38 S.Ct. 209, 62 L.Ed. 469 (1918); *Michelson v. United States, supra*, 335 U.S. at 475, 69 S.Ct. 213.

**14.** *Michelson v. United States, supra*; Fed.R. Evid. 404(a); Manual, *supra*.

**15.** *Michelson v. United States, supra*, 335 U.S. at 476, 69 S.Ct. at 218.

**16.** *Id.*; Wigmore, Evidence, 3d ed. (1940) § 57.

**17.** *Michelson v. United States, supra*; *Edgington v. United States*, 164 U.S. 361, 17 S.Ct. 72, 41 L.Ed. 467 (1896); Fed.R.Evid. 404(a)(1). *See also* Manual, *supra*, paragraph 138*f*(2), which provides that

"[t]o show the probability of his innocence, the accused may introduce evidence of his own good character, including evidence of his military record and standing as shown by authenticated copies of efficiency or fitness reports or otherwise and evidence of his general character

as a moral, well-conducted person and law-abiding citizen."

**18.** *Michelson v. United States, supra*; Fed.R. Evid. 404(a)(1); Manual, *supra*, paragraph 153 *b*.

**19.** 335 U.S. at 479, 69 S.Ct. at 220.

**20.** Wigmore, Evidence, *supra* § 58.

**21.** *Id.*; *see generally United States v. James*, 181 U.S.App.D.C. 55, 555 F.2d 992 (1977).

**22.** *See* footnotes 12–21 and the accompanying text.

**23.** 29 Am.Jur.2d, Evidence § 341; Fed.R.Evid. 404(a)(1); Manual, *supra*, paragraphs 138*f* and 149*b*.

**24.** U.S.Const. Amend. V; 18 U.S.C. § 3481.

nesses.[25] Hence, though he may not be cross-examined as to his general character, he may be so examined as to his credibility.[26] Additionally, while independent evidence of general bad character may not be introduced unless the accused has placed his character in issue by offering evidence of his good character, the prosecution is permitted to impeach a defendant-witness' credibility by proof of a bad reputation in his community for truth and veracity.[27] Testimony of this nature is limited to the general reputation for truth and veracity in the community in which he lives or works.[28] In this regard, paragraph 138$f$(1), Manual for Courts Martial, United States, 1969 (Revised edition), provides:

> By "reputation" is meant the repute in which a person generally is held in the community in which he lives or pursues his business or profession. Testimony concerning the reputation of a person in the community in which he lives or pursues his business or profession *must* come

from someone whose knowledge of that reputation was gained from having himself been a member of that community in question. [emphasis added.]

Moreover, it is not enough that such testimony be based upon what some or a few others have said regarding the reputation of the accused;[29] the witness must be able to state what the community generally believes.[30] Testimony or other evidence concerning specific acts or conduct of the accused is generally inadmissible as evidence of reputation.[31]

 We recognize the rule that permits the prosecution to present evidence of a defendant's bad reputation for truth and veracity where the defendant chooses to testify, even if he does not first offer testimony that he is of good repute.[32] As with evidence of prior convictions offered to impeach the credibility of a defendant who testifies in his own defense, the admissibility of this type of impeachment evidence is left to the sound discretion of the trial

---

**25.** Manual, *supra*, paragraph 149$b$(1), provides that ". . . [o]n the question of his credibility . . . a witness may be cross-examined concerning any subject touching upon his worthiness of belief . . . ."
An accused who voluntarily testifies as a witness becomes subject to cross-examination upon the issues concerning which he so testifies and upon the question of his credibility . . . .". *See Reagan v. United States*, 157 U.S. 301, 15 S.Ct. 610, 39 L.Ed. 709 (1895); Manual, *supra*, paragraphs 138$f$ and 153$b$; 3A Wigmore, Evidence § 890 (Chadbourne rev. 1970); and 29 Am.Jur.2d, Evidence § 341.

**26.** Manual, *supra*, paragraph 149$b$(1); *see also* paragraph 153$b$.

**27.** *United States v. Griggs*, 13 U.S.C.M.A. 57, 32 C.M.R. 57 (1962); *United States v. Walker*, 313 F.2d 236 (6th Cir. 1963), cert. denied, 374 U.S. 807, 83 S.Ct. 1695, 10 L.Ed.2d 1031 (1963); *Hodge v. United States*, 414 F.2d 1040 (9th Cir. 1969); *United States v. Harris*, 331 F.2d 185 (4th Cir. 1964); Manual, *supra*, paragraph 138$f$ (2); McCormick on Evidence, § 44 (1954); 3A Wigmore, Evidence § 925 (Chadbourne rev. 1970). We point out that this case does not involve opinion evidence referred to in Manual, *supra*, para. 138$f$(1).

**28.** *Michelson v. United States, supra*; *Montgomery v. Crossthwait*, 90 Ala. 553, 8 So. 498 (1890); *Henson v. State*, 239 Ark. 727, 393 S.W.2d 856 (1965); *Amos v. State*, 209 Ark. 55, 189 S.W.2d 611 (1945); *Columbia National Bank v. MacKnight*, 29 App.D.C. 580 (1907);

*McDonough v. Goodcell*, 13 Cal.2d 741, 91 P.2d 1035, 123 A.L.R. 1205 (1939); *Rice v. State*, 35 Fla. 236, 17 So. 286 (1895); *Powell v. State*, 101 Ga. 9, 29 S.E. 309 (1897); *McCarty v. People*, 51 Ill. 231 (1869); *Engelman v. State*, 2 Ind. 91 (1850); *Halligan v. Lone Tree Farmers Exch.*, 230 Iowa 1277, 300 N.W. 551 (1941); *Colburn v. Marble*, 196 Mass. 376, 82 N.E. 28 (1907); *People v. McLean*, 71 Mich. 309, 38 N.W. 917 (1888); *State v. Turner*, 246 Mo. 598, 152 S.W. 313 (1912); *State v. Forshner*, 43 N.H. 89 (1861); *People v. Van Gaasbeck*, 189 N.Y. 408, 82 N.E. 718 (1907); *Nance v. Fike*, 244 N.C. 368, 93 S.E.2d 443 (1956); *State v. Ellis*, 243 N.C. 142, 90 S.E.2d 225 (1955); *McDermott v. State*, 13 Ohio St. 332 (1862); *Frazier v. Pennsylvania R. Co.*, 38 Pa. 104 (1861); *State v. Fitzsimon*, 18 R.I. 236, 27 A. 446 (1893); *Re Monaghan*, 126 Vt. 53, 222 A.2d 665 (1966); *Spannell v. State*, 83 Tex.Cr. 418, 203 S.W. 357, 2 A.L.R. 593 (1918); *De Grate v. State* (Tex.Cr.App.), 518 S.W.2d 821 (1975); *State v. Marfaudille*, 48 Wash. 117, 92 P. 939 (1907); *Muetze v. Tuteur*, 77 Wis. 236, 46 N.W. 123 (1890). *See also* 5 Wigmore, Evidence § 1616 (Chadbourne rev. 1974).

**29.** 29 Am.Jur.2d, Evidence § 344. *See also State v. Ellis, supra.*

**30.** *Id.*

**31.** 5 Wigmore, Evidence § 1616 (Chadbourne rev. 1974).

**32.** *See* text at footnotes 23–27.

judge who must determine whether its probative value is outweighed by its prejudicial effect.[33] We hold that where the accused does not first introduce evidence of his good reputation for truth and veracity, such impeachment evidence should be viewed by the trial judge with caution and, except where the testimony appears well supported, it should be rejected. When not offered as rebuttal evidence, such testimony introduces matter that is foreign to the merits of the case and invites the triers of fact to judge the accused's alleged commission of crime on an extraneous basis which diverts their minds from the matter at hand. As has been stated by the United States Supreme Court,[34] "[t]o thus digress from evidence as to the offense to hear a contest as to the standing of the accused at its best opens a tricky line of inquiry as to a shapeless and elusive subject matter. At its worst it opens a veritable Pandora's box of irresponsible gossip, innuendo and smear. . . ." *Id.* at 480, 69 S.Ct. at 220. We also agree with the view of the United States Court of Appeals for the Second Circuit that the probative value of such evidence is doubtful when weighed against the prejudice it might create in the minds of jurors.[35]

In the instant case, the admission of Captain Karlson's testimony as to the appellant's reputation for truth and veracity was error for several reasons. First, it must be noted that, contrary to the requirements of paragraph 138*f*(1) of the Manual, Karlson was not a member of the community in which the appellant lived[36] or worked.[37] Second, he was not aware of the appellant's general reputation for truth and veracity in either community.[38] We emphasize here that Captain Karlson was a military judge and that his duties included that of presiding over courts-martial. The appellant was not in any way connected with that activity. Moreover, Karlson never stated that he was aware of the appellant's reputation for truth and veracity in the community in which he lived.[39] Third, Karlson's testimony was shown to be based upon what some or a few people had said regarding the

---

**33.** *United States v. Augello,* 452 F.2d 1135 (2d Cir. 1971); *United States v. Palumbo,* 401 F.2d 270 (2d Cir. 1968), *cert. denied* 394 U.S. 947, 89 S.Ct. 1281, 22 L.Ed.2d 480 (1969).

**34.** *Michelson v. United States, supra.*

**35.** *United States v. Augello, supra.*

**36.** On the question of the community in which the appellant lived, Captain Karlson testified as follows:

"Q. Which community are you talking about? You don't even know where he lives, do you?

A. I do not know his address, that's correct.

Q. Which community are your talking about?

A. The social community in which he involved himself, which was with the—to a great extent, to my knowledge, the people with whom his wife was employed.

Q. You are talking about the people who testified here today aren't you?

A. Yes."

**37.** On the question of the community in which the appellant worked, Captain Karlson testified as follows:

"Q. Are you aware of the reputation of the accused in his military community—not your own personal opinion—but his reputation in his military community for truth and veracity?

A. If you define military community as the unit in which he works, No."

**38.** In his dissent, Judge Cook suggests that the phrase "in the community in which he lives" contemplates more than an exact geographic location and quotes from *People v. Colantone,* 243 N.Y. 134, 152 N.E. 700 (1926), which describes the complexities of modern living in large municipalities like New York where people very largely live in tenements and apartment houses and where a man may be entirely unknown in the community where he resides. Since Augusta, Georgia, the city where the appellant resided, simply bears no resemblance to New York, *People v. Colantone* is thus inapplicable to Tomchek's case. Moreover, Captain Karlson admitted that he did not live in the "section" of Augusta where Tomchek lived. He came in contact with Tomchek at the home of Sgt. St. Louis who resided in the Deerwood Forest "section" outside of Augusta, a neighborhood in which he, Captain Karlson, also resided. Karlson stated that Tomchek lived outside that "section." "I'm not sure of his exact address." Thus, *Captain Karlson did not come within the purview of witnesses qualified under paragraph 138f(1) of the Manual for Courts-Martial to testify regarding Tomchek's reputation for truth and veracity.*

**39.** *See* footnotes 36–37.

appellant's reputation, not what is generally said of him.[40] When cross-examined concerning the basis for his testimony, Captain Karlson referred to the opinions of some of the acquaintances of appellant's wife that the appellant was a "rather poor individual to begin with."[41] Pressed further, Karlson referred to the hearsay statements of the wife's acquaintances that the appellant conducted himself "indiscretely" with various girl friends while his wife was away.[42] Fourth, no part of Karlson's testimony regarding the appellant reflected a bad reputation for truth and veracity. All that appears in his testimony is that Karlson had been in the appellant's presence at a few social functions at the home of an acquaintance of the appellant's wife with some of her friends and work colleagues.[43] Whatever was said there was hardly reflective of the appellant's general community reputation. Therefore, Captain Karlson should not have been permitted to testify concerning the appellant's reputation for truth and veracity.

We have considered the fact that this case was tried by a military judge alone and thus the likelihood of prejudice is normally rendered less probable than it would be if the case had been tried by a jury panel. However, we believe that the transgression by Captain Karlson's testimony upon the appellant's right to a fair and impartial trial is so great that prejudice will be presumed.

Accordingly, the decision of the United States Army Court of Military Review is reversed. The record of trial is returned to The Judge Advocate General. A rehearing may be ordered.

FLETCHER, Chief Judge (concurring):

I concur with the law as set forth by my Brother Perry. I also conclude that the testimony of Captain Karlson violated the guidance of the American Bar Association Code of Professional Responsibility and Code of Judicial Conduct, and that the facts of this case require reversal. The attempt by the Court of Military Review to quantify the amount of prejudice flowing from this

40. See text at footnote 29.

41. "Q. Where was this?
A. This would be the community which I was aware of, which was the one in which I most often saw him. It would be made up of individuals with whom, his wife was employed and he had, to my knowledge, numerous contacts and social engagements.
Q. Was this on post or off post?
A. Both.
Q. Where off post?
A. I can think of, just off hand, at the home of Sergeant St. Louis.
Q. Where does he live?
A. He lives in the Deerwood Forest Section outside of Augusta, Georgia. I live in that section myself.
Q. All right, what section does the accused live in?
A. He lived outside that section. I'm not sure of his exact address.

. . . . .

Q. What do these people say about him and who said it?
A. All right, if you really want me to answer that—
Q. Yes, answer it. Among other things, who said it? Tell me who said it first.
A. The first opinion I had was from—I can't remember whether it was the Captain who was here previously, who has since been RIF'd from the service, who was a Henry—I can't remember his last name off hand—it's been over a year—he was a rather heavy set individual—I believe he was here at that time when I first had occasion to mention the accused as someone who had married a member of his office, and that he had met, and I had met the accused at that time. Later on, as I stated, I lived in the same area as Sergeant St. Louis and Sergeant Barnes, and this was over a period of over a year, during a period in which this marriage took place, and they were well acquainted with the accused and his wife. They had functions with him, and throughout this period their opinion of him deteriorated substantially. They were all aware, if you want me to state it, he had a previous conviction in the military and they thought he was a rather poor individual to begin with.
Q. And this makes him untruthful, I suppose.
A. I'm not done yet, and throughout this period they were also aware particularly when his wife was away at school that he was, shall we say, conducting himself indiscretely with various girl friends. . . ."

42. Id.

43. Id.

error constitutes an exercise in guesswork which I find unsuitable as a means of resolving the issue. The trial judge in this case should have *sua sponte* raised this matter when Captain Karlson was first called to testify, for this question went to the fundamental fairness of the hearing. His failure to do so compels the result we reach, for the record is absolutely devoid of any proper foundation or basis for the admission of this testimony.[1]

I further share much of the condemnation both as to the lack of probativeness, and the shallowness of Captain Karlson's knowledge of the appellant. As the military judge specifically limited all inquiries to the matter of the appellant's *reputation* for truth and veracity, as opposed to the witness' *opinion* as to the appellant's credibility,[2] I join in Judge Perry's conclusion that "no part of Karlson's testimony regarding the appellant reflected a bad reputation for truth and veracity." As such, the trial judge should have stricken all the testimony offered by this witness.

COOK, Judge (dissenting):

As there was no objection at the trial level to the appearance of the witness on the basis of his status as a trial judge, the circumstances giving rise to the witness' appearance were submitted to the Court of Military Review through post-trial affida-

vits from the trial counsel and said witness. The Court of Military Review noted the following concerning the issue:

There is no ethical problem in this case if there was no choice on the part of the witness. Although affidavits have been submitted on the question of the existence of choice, we are reluctant to decide an ethical issue on the basis of affidavits alone. It is well established that the determination of the ethical question is a separate one from the question of whether the conduct involved operated to the prejudice of the accused. (Footnotes and citations omitted.)

We focus on the central issue of possible prejudice to appellant by assuming that the witness had some choice and testified in violation of the canons cited above. Even under that assumption there was no prejudice.

It is argued that a violation of the ABA Code of Judicial Conduct, Canon 2, by the voluntary appearance of a judge as a witness for a party renders his testimony inadmissible. I need not reach that contention or the effect of a failure to assert it at trial, as I am convinced there was no violation of the Canon.

The principal opinion (pp. 70 and 68 n. 4) avoids the issue because the Court of Military Review was "reluctant" to decide

1. I recognize that under the above-mentioned tenets the prosecution conceivably could have laid the proper foundation; however, nothing in this record even hints at its existence. Further, it should be obvious that only in the rarest of instances, even assuming a proper foundation, should a judge be permitted to testify as was done in the instant case.

2. The military judge set the exact perimeters for the testimony to be given by Captain Karlson following a defense motion in the following manner:

MJ: Let me ask a question of the witness. Are you aware of the reputation of the accused in his military community—not your own personal opinion—but his reputation in his military community for truth and veracity?

He repeatedly cautioned the witness that he was "not talking about personal opinion," but was instead confining all inquiries to "his [the accused's] reputation for truth and veracity."

Under this imposed limitation, I conclude that no admissible testimony was given by Captain Karlson, for the record reveals that he only offered either his own personal opinion or offered reputation testimony as to the appellant's bad character, neither of which fall within the category of the appellant's reputation for truth and veracity.

I do believe that both paragraph 138f, Manual for Courts-Martial, United States, 1969 (Revised edition), and Rule 608(a) of the Federal Rules of Evidence permit the use of opinion testimony on questions of an accused's credibility (or any other character trait properly placed in evidence) within the sound discretion of the trial judge. The cited Manual provision unfortunately fails to clearly delineate between "reputation" testimony and "opinion" testimony; as a result, the two often merge in the minds of many military practitioners.

the matter on the basis of affidavits submitted by the Government. However, the question was raised for the first time on appeal and the appellant has not disputed or opposed the averments of fact in these affidavits. In my opinion, therefore, all necessary facts are before us and the matter is ripe for decision. As the Court observed in *United States v. Bielecki*, 21 U.S.C.M.A. 450, 454, 45 C.M.R. 224, 228 (1972), citing *Hoover v. Allen*, 241 F.Supp. 213 (S.D.N.Y.1965), "[t]he legal effect given to a set of undisputed facts represents a pure question of law." *Accord, United States v. Ware*, 24 U.S.C.M.A. 102, 103, 51 C.M.R. 275, 276, n. 4, 1 M.J. 282, 284 (1976); *see Milhouse v. Levi*, 179 U.S.App.D.C. 1, 548 F.2d 357 (1976); *United States v. Jones*, 174 U.S.App.D.C. 34, 527 F.2d 817 (1975).

In an affidavit dated May 23, 1975, the trial counsel asserted that he asked the witness to testify but such witness was "under no compulsion to testify." On June 12, 1975, the trial counsel executed another affidavit in which he explained the quoted language that while the witness was not given a written order to appear, "I was acting in my role as trial counsel when I asked CPT Karlson to testify." He further explained that he considered a written order unnecessary as the witness would be present at the situs of the trial during the time in question. Captain Karlson executed an affidavit on June 10, 1975, in which he asserted:

I was later asked by the Trial Counsel if I would be a Witness. I informed him that if ordered to testify, I would do so.

A few days prior to the trial, the Trial Counsel contacted me and told me a time and date to be at the courtroom to testify. I considered this to be an Order to Appear, enforcible under Article 92, U.C.M.J. and complied with the order.

I, at no time volunteered to testify.

Paragraph 115*b*, Manual for Courts-Martial, United States, 1969 (Revised edition), charges the trial counsel with the responsibility of obtaining witnesses in the following manner:

The attendance of a person in the military service stationed at the place of the meeting of the court, or so near that travel at government expense will not be involved, will ordinarily be obtained by notification, oral or otherwise, by the trial counsel, to the person concerned of the time and place he is to appear as a witness.

The majority note that Canon 2 does not grant a judge "a privilege against testifying in response to an official summons." Obviously Canon 2 and the commentary thereto did not take into account the procedure existing in the military where the prosecutor is charged with the administrative responsibility of obtaining witnesses. Accordingly, I would hold that the notification to Captain Karlson to appear as a witness from the trial counsel acting in his administrative capacity was sufficient to remove Captain Karlson's testimony from the proscription of Canon 2. Furthermore, the record reflects that the Government presented Captain Karlson's testimony because he was personally familiar with the matter to which he testified, not because it desired to obtain an advantage from his status as a military judge.

Turning to whether Captain Karlson was properly allowed to testify to appellant's reputation for truth and veracity, paragraph 138*f*(2), Manual, *supra*, specifically sets forth that the prosecution may impeach the credibility of an accused who testifies by demonstrating that he has a bad character for truth and veracity. Such character may be shown by both reputation evidence and the opinion of a witness. *United States v. Griggs*, 13 U.S.C.M.A. 57, 32 C.M.R. 57 (1962); *United States v. Haimson*, 5 U.S.C.M.A. 208, 17 C.M.R. 208 (1954); paragraph 138*f*(1), Manual, *supra*. The Manual rule is consistent with Fed.R.Evid. 608(a).

Paragraph 138*f*(1), Manual, *supra*, defines "reputation" and sets forth the qualifications of a reputation witness in the following manner:

By "reputation" is meant the repute in which a person generally is held in the community in which he lives or pursues

his business or profession. Testimony concerning the reputation of a person in the community in which he lives or pursues his business or profession must come from someone whose knowledge of that reputation was gained from having himself been a member of the community in question.

In the present case Captain Karlson testified that he had spoken with the accused on numerous occasions and had "dealt with people who have dealt with him." Although the witness was unaware of the appellant's reputation within the unit in which the appellant worked he was "aware of his reputation in the social community in which he has contacts." On cross-examination the following colloquy ensued between the witness and defense counsel:

Questions by the individual counsel.

Q. Now Captain Karlson, would you describe this community that you refer to which has this opinion as you have testified as to the accused's reputation for truth?

A. I have described it as a social community within which he functioned.

Q. Where is this?

A. This would be the community which I was aware of, which was the one in which I most often saw him. It would be made up of individuals with whom his wife was employed and he had, to my knowledge, numerous contacts and social engagements.

Q. Was this on post or off post?

A. Both.

Q. Where off post?

A. I can think of, just off-hand, at the home of Sergeant St. Louis.

Q. Where does he live?

A. He lives in the Deerwood Forest Section outside of Augusta, Georgia. I live in that section myself.

Q. All right, what section does the accused live in?

A. He lived outside that section. I'm not sure of his exact address. I can remember meeting him at social functions there and talking with him and with other people who were there and were acquainted with him.

Although Captain Karlson did not know the appellant's "exact address," he had sufficient contacts with the community in which the appellant was well-known and had established a reputation. While the Manual uses the phrase, "in the community in which he lives," such phrase contemplates more than an exact geographic location. As noted in 29 Am.Jur.2d § 347:

> The rule is broadly stated that evidence of the good or bad character of a party must relate and be confined to his general reputation in the community or neighborhood in which he resides or has resided. However, the term "community" or "neighborhood" is not susceptible of exact geographical definition, but means, in a general way, where the person is well known and has established a reputation, so that the inquiry is not necessarily confined to the domicile or residence of the party whose reputation is in question, but may extend to any community or society in which he has a well-known or established reputation. [footnotes omitted.]

*Also see United States v. Johnson*, 3 U.S.C. M.A. 709, 14 C.M.R. 127 (1954). Thus, in the modern context with the increased mobility of our society, the "community in which he lives" includes more than the block or immediate surroundings of the appellant's residence. Indeed, the New York Court of Appeals recognized this factor in our society and held the following in *People v. Colantone*, 243 N.Y. 134, 152 N.E. 700, 702 (1926):

> . . . In large municipalities like the city of New York, where people now very largely dwell in tenements and apartment houses, a man may be entirely unknown in the community where he resides. It is not infrequent for a man to live in one building for years without knowing his neighbors, or anything about them. The only place where he can make a reputation, good or bad, is among his associates in his particular activities or in the personal contacts of his life where he actually lives it. . . .

We think that the Appellate Division was right in ruling that to confine the evidence of the defendant's reputation in this case merely to the place where he resided was too limited an application of the rule of good character evidence, and that the testimony offered should have been received. The value of the evidence of good character is not always dependent upon the place of residence; its worth and weight are measured by the opportunity for obtaining a reputation, whether it be at home or abroad. The determining factor is whether the community in which the defendant has lived his life is sufficiently large for the persons to become acquainted with his character and to form a general opinion of it. This we call general reputation.

Cited with approval in *United States v. Oliver*, 492 F.2d 943 (8th Cir. 1974). Indeed, Fed.R.Evid. 803(21) has adopted the modern approach in the following manner:

> *Reputation as to character.* Reputation of a person's character among his *associates or* in the community. [Emphasis added.]

Finally, the military judge limited his consideration of the evidence to its effect upon the appellant's reputation for truth and veracity. As the evidence of appellant's reputation was properly admitted under the provision of paragraph 138*f*(2), Manual, *supra*, and the previous decisions of this Court, I would affirm the decision of the United States Army Court of Military Review.